## Hume *v.* Beale's Executrix.

1. Although a former suit about the same subject-matter as a later one may not operate strictly as *res adjudicata*, yet it may well be referred to when it was heard on the scene of the transaction complained of, and when it relates to a transaction forty years old, as an element by which a conclusion at a later day in accordance with its result may be assisted.
2. The rule of equity applied, that if a *cestui que trust*, after becoming *sui juris*, has with full knowledge of a breach of trust, for a long time acquiesced in it, equity will not relieve him.
3. Accordingly, a bill by *cestui que trusts* was dismissed, where all the grounds of action had occurred between twenty and thirty years, and the alleged breach of trust had taken place thirty-seven years before the bill was filed, and the trustee was dead.
4. This, although the *cestui que trusts* were women and the trustee a lawyer, who had married their half-sister.

Error to the Supreme Court for the District of Columbia; the case being thus:

Benjamin Berry, of Prince George's County, Maryland, owning a farm in that county, about twenty miles from Washington City, stocked with thirty slaves, and with proper animals and implements of husbandry, on which farm his son and the wife Eleanor of this son, with their three children, named respectively, Barbara, Amanda, and Rosalie, were living, conveyed it in March, 1826 (his said son having then recently died), to Robert Beale (a young lawyer of Washington City, a friend of the family, and who in 1829 married a daughter of the said Mrs. Eleanor Berry, by a former husband) on these trusts " *and no other;*" that is to say, " *to retain the legal title* to all the said property during the life and widowhood of the said Eleanor; and after her death or marriage, until such time as the eldest of the children shall

come of age or be married, on which event or events the said Robert shall convey the unconditional title in fee to all the property, both real and personal, unto the said children and their heirs, or such of them as may be living at the time of such conveyance, and to the issue of any such as may be dead, &c. . . . And the said Robert shall permit the said Eleanor to have and enjoy the sole and exclusive use of all the said property for and during the time in which she shall and may live and remain unmarried, without molestation or hindrance of him, the said Robert, or said Benjamin, or any other person or persons whatsoever."

On the 18th of December, 1827, Benjamin Berry, the grantor, died.

In the autumn of 1828 Mrs. Eleanor Berry took up her residence in Washington City, and there became acquainted with, and, as was rumored, was married (secretly, in order to avoid a forfeiture of her life estate), to a certain Col. Owings. While on the farm, according to the testimony, she " lived finely, and entertained a great deal." Her course of life in Washington also was expensive. She had very little property of her own, and that not in money.

. In the years 1828 and 1829, that is, after the death of Mr. Berry, the grantor, and before the year 1830, nearly all the slaves had disappeared from the farm; the slaves were " not sold in a body but picked off one or two at a time; that is, sent to a place where the traders could get them; locked up there till the traders came."

Most of the farm stock had equally disappeared.

Early in 1830 Beale filed a bill against Mrs. Berry in the High Court of Chancery of Maryland to prevent her from further disposing of the personal property. And immediately thereafter, in 1830, under or in consequence of some order of court, took possession of the land and what remained of the personal property.

In the summer of 1830 Mrs. Berry left her house in Washington City, and never returned to it; "went off travelling," said a witness in the case, " where, I do not know."

In December, 1830, the three children, by their uncle as

next friend (he residing on an adjoining estate), filed a bill in the County Court of Prince George's County, Maryland, against Beale, Mrs. Berry, and Owings (to whom the bill alleged that she was married), setting forth the sale of all the personal property and waste of the proceeds, and praying the removal of Beale as trustee, an account, and the appointment of a receiver. Mrs. Berry was not served with process, being off travelling. A receiver was appointed and gave bond. Beale appeared and answered. He admitted in his answer that Mrs. Berry, who, he asserted, had been rightfully in possession and control of the property, had, without his knowledge or authority, greatly impaired and injured the value of the trust estate; and alleged that finding all other means ineffectual to prevent her further disposing of the property, he had appealed for protection to the High Court of Chancery of Maryland, which was granted, and that he had abandoned his residence in Washington at great personal sacrifice, and was living on the farm for the purpose of taking care of it and what remained of the personal property. He denied that he was in anywise remiss or negligent of his duties as trustee, or that he had anything to do with the sale of the negroes or other personalty. The cause was regularly heard, and a decree made dismissing the bill.

In February, 1833, the daughter Barbara married Mr. Hume.

In 1834 the trust property was sold under a decree of the court; the share of each of the three daughters being $3000. The share of the youngest daughter, Miss Rosalie, was left in the hands of Beale, who was intrusted by the said Miss Rosalie with the management of it. This money was paid, after Miss Rosalie's death, to her administratrix and sister, Mrs. Hume.

In 1839, Mrs. Hume attained the age of 21 years.

In September, 1842, Mr. Hume died.

In 1843, Mrs. Eleanor Berry was married to one Ferguson.

In November, 1844, Amanda married Mr. Crosby.

In January, 1857, Mrs. Eleanor Ferguson (Berry) died.

In September, 1857, Mr. Crosby died.

In May, 1860, Miss Rosalie Berry died unmarried; her sister, Mrs. Hume, becoming her administratrix.

In November, 1866, Mr. Beale, the trustee, died, leaving his daughter executrix of his estate.

In April, 1867, the surviving daughters, Mrs. Hume and Mrs. Crosby (their husbands being now dead), filed a bill in the court below against this executrix of Beale, alleging that he had sold and converted to his own use a considerable portion of the personal property, the proceeds of which he had used very advantageously to himself, and had suffered Mrs. Berry, the widow, to squander the rest. The bill giving as an excuse for not instituting proceedings sooner, that Beale had from time to time put the complainants off with promises of settlement; that having married their half-sister, "he took advantage of that relationship to abuse the confidence which the relationship naturally inspired, and to turn the same to his own pecuniary interest and advantage."

The answer denied the breach of trust, and while alleging that the transactions narrated in the bill, so far as they were founded in truth, occurred nearly forty years before, and before the respondent was born, and consequently that she could have no personal knowledge of the circumstances, yet set forth a narrative of facts which tended to show that the waste of the property was committed solely by Mrs. Berry, and that Beale had used his efforts to prevent it, and did finally arrest it, but not until most of the personal property had been made away with. It stated that the farm, and what trust property remained, had prior to 1834 been sold by order of the court, by trustees duly appointed, and the proceeds distributed. It denied that Beale ever made the admissions, promises, and excuses alleged in the bill, or that the complainants ever asserted against him in his lifetime the claim now made or any claim; and asserted contrariwise that the complainants had received all that they were entitled to, and that their husbands had used what money they

had, and left them, in widowhood, dependent on their relatives.

The answer set up also certain special defences as—

The suit against Beale in the County Court of Prince George's County.

The statute of limitation [three years in the District], and independently of it the laches and lapse of time.

The testimony chiefly relied on by the complainants was that of Mrs. Hume, one of the complainants; of a white witness named Douglass, of another, named Brashears, and of two old colored servants, Johnson and Brooks, who had been on the farm.

The testimony of Mrs. Hume was received under the act of Congress of July 2d, 1864,* which enacts that

"In courts of the United States there shall be no exclusion of any witness . . . in civil actions, because he is a party to or interested in the issue joined;"

no objection having been raised to it, so far as appeared by the record, under the act of March 3d, 1865,† amendatory to the said act, which amendatory act provides—

"That in actions by or against executors, administrators, or guardians, in which judgment may be rendered for or against them, neither party shall be allowed to testify against the other as to any transaction with or statement by the testator, intestate or ward, unless called to testify by the opposite party."

Mrs. Hume testified as follows:

"After my grandfather Berry's death, in 1827, the property commenced to go. It went by degrees. From 1828 to the summer of 1830 everything was spent except some old negroes: They were sold by my mother and Mr. Beale. The real estate was sold by commissioners appointed by the court. My husband received my portion in person. Mr. Beale paid me my sister's portion in driblets. He never paid me anything else. I called upon him repeatedly to settle his trusteeship. Three or four years before his death, 'most every time I saw him, I

---

* 15 Stat. at Large, 351.                    † Ib. 533.

asked him for a settlement, and told him my inability to live. I told him my situation, and told him it was very destitute. These conversations occurred almost every time I saw him. I told him almost every week, when I saw him, that it was high time to make a settlement. He did not give me any money, and he never made any settlement. He made a great many promises, and that is all. The reason I never instituted this suit before was he made so many promises from time to time that he would settle. He never made me any payments at all outside of the $3000 which he received as my share of the proceeds of the farm. At the conversations I have spoken of, about a settlement, no one was present but ourselves. He never talked before third persons unless they were interested. I occasionally wrote to Mr. Beale, and he answered my letters. In his letters he never spoke anything of the wasted property. I never wrote to him about any of it, except some servants that Otho Beale bought, and Mr. Beale (for me) brought suit to recover them. I always thought that Mr. Beale got part of the money that the personal estate sold for. My husband thought Mr. Beale had done very wrong. He was himself a lawyer. He spoke to me in his lifetime, in 1834 or 1835, of bringing a suit, and asked me to join him. I told him it was of no use, as Mr. Beale was poor and we could make nothing out of him at that time.

"I never was present when any negroes were sold. I never saw any money paid by the traders for them. My mother had some negroes which came by her mother's (Mrs. Lane's) estate. Mrs. Lane was rich. They came to her before her marriage with my father, Mr. Berry, Jr. They were made over to my half-brother and to Mrs. Beale, my half-sister."

Douglass, who testified that he had owed some money to Mr. Beale, said:

"Mr. Beale was pressing me for the money. He said that he owed these ladies (half-sisters of his wife) some money, and that he wanted the money for them. These conversations ran through a number of years, to the day that I settled with him. He said that he wanted $5000. I do not remember that he mentioned real estate to me. He told me that the way he became indebted to the ladies was that he had charge of their money, and had borrowed it. He said that he must raise the

money from me or sell his house to raise it. In speaking of these ladies, I think he mentioned one of them as Berry : he simply used the name of Berry."

Brashears testified only that he lived on an adjoining farm and knew Beale; that when Beale was appointed trustee, he was regarded as poor, and that he afterwards owned a house in which he lived; that he thought Beale had exercised control over the farm from the time he was married; and that "the property on it was pretty generally on the travel from the time Mrs. Berry moved to Washington till it was all sold."

One of the old slaves, Brooks, testified thus :

"Mr. Beale had no property, before he was married, but a house. After the deed of trust was given and Mr. Beale got the property in his own hands he was like the green bay tree by the river of water. He spread out—he got everything he wanted. He had control as a master over everything; to sell or not to sell, as he pleased. If he chose to do anything, Mrs. Berry could not stop him. I never saw him do anything, because I was not present, but I know he disposed of all the property. I never saw him take away any of the property; I *mean*, saw him sell any, and I never saw him receive any money for it. The only way that I know he sold the slaves was that I missed them, and as they could not be sold by law without his consent, I believe he sold them. I know it must have been done by his consent, because nobody else could have done it. He was the guardian of the children. Before Mrs. Berry moved to Washington, she lived in very handsome style and had plenty of everything. She was rich."

The other negro, Johnson, testified :

"As far as I know, Mrs. Berry and Mr. Beale were hand-in-glove, and between them they sold the colored people; somewhere in the neighborhood of thirty-five; not one was left to tell the tale. Mr. Beale would come down from Washington once or twice a week. I don't know who received any of the money for the negroes. I have seen the negro-traders there often. Mr. Beale would bring them down there from the city, and have the negroes hiding about like young rabbits. And I

have often heard the servants say that they thought *Mr. Beale ought to interfere and protect the children.* I never knew him to interfere to prevent them being sold. He only told me that he would see that I was not sold to Georgia. My wife belonged to him. She came from old Mrs. Lane. I never saw Mr. Beale have any possession of any of the servants, except when any of them were to be sold, when, of course, he always had a hand in it. There were only two old men and two old women, three or four house servants, and myself left on the farm after Mrs. Berry came to Washington. I flew the track; they sold me running. I think one of the old ones that were left was afterwards sold to a brother of old Mr. Berry. Mrs. Eleanor Berry had no property when she married young Mr. Berry. His father gave him the farm, and stock, and servants, and let him have it to make what he could, but gave him no title to it, or any of it, *because his wife had the reputation of being an extravagant woman, and he was fearful that the children might come to want.*"

Certain letters were introduced by the defendants from Mrs. Hume to Mr. Beale, by way of discrediting her testimony. They were of a very confidential kind. Parts of them were thus :

"NASHVILLE, December 1st, 1837.

" DEAR MR. BEALE : You will oblige me very much, if you can spare the time, to go to Marlboro' this court, for the purpose of getting the money, or a part of it, that is due me. I am very much in want at this time. I would not trouble you, but necessity is the first law of nature ; therefore I was compelled to address you. My circumstances are such that I cannot do without a little money. Mr. Hume is out of employment entirely ; dissipated and too indolent to exert himself for a support. We are all living with his mother ; she is not able to keep us, and can hardly get along with her own family. I cannot stay here. I am a stranger here, no one to aid me in the most trifling matter. If I was where I was known I could get along somehow or other. I should like to be with my relations. I think Otho Beale would help me if he knew my situation. I should like to get in a school as an assistant teacher, so as I could be making a living for myself and children. I would exert myself to the utmost to get along. I have said enough of this matter for you

to judge of my situation. . . . I wish I had never have left the city, and have taken your good advice. I cannot say any more. You can see what my feelings are. Do answer this, and please to attend to the request I have made of you about getting the money. Give my best love to sister and brother, and accept a great share of love from

" Your true friend,

" Barbara."

" June 5th, 1846.

" R. Beale, Esq. : Your note has been received in which you refuse to see me again, and, strange to say, you have charged me with falsehood, duplicity, and treachery. · What crime have I committed that you should apply such epithets to my name? Thank God, I have an approving conscience; one that can say I have never, my dear brother, wronged you in thought or word. I always spoke of you in the most affectionate manner. I admit I have been in error, but am ready to make reparation. Don't judge me so harshly. You have wronged me. Forgive the innocent. I truly repeat, my dear brother, speak kindly to me, and don't cast me on the cold world without a cent. I will go to Baltimore; stay there in retirement. Time will show you that I am not what you consider me. I will not stay here longer. . . . Soon a lonely grave will be the only mark that I shall leave behind me. I wish to see you once more. · I shall be then better satisfied. Don't refuse me this small favor. No money or friends! Heaven's support in this hour of affliction is all I pray for.

" B."

It appeared that the husbands of both Mrs. Hume and Mrs. Crosby (the daughters Barbara and Amanda) were improvident men, who always wanted money.

The court below being equally divided in opinion the bill was dismissed, and the complainants took this appeal.

*Messrs. Moore and Hughes, for the appellants, the complainants below:*

The claim of the complainants is not barred by the lapse of time or the statute of limitations. The trust is an *express*

*trust.* The trustee was the brother-in-law of the complainants, and when he took possession of their property they were of tender years. It is not pretended that any settlement of Beale's trusteeship was ever made. No account was ever rendered to the court, or anywhere else, by Beale. A large amount of personal property came to his hands. The deed of trust vested the legal title to all of the property in him, and Mrs. Berry had nothing but the *use* under said deed. That Beale profited by it is shown by the testimony of Mrs. Hume, and of Johnson and Brooks, old family servants. That he acknowledged his obligation, and promised to pay, is shown by the testimony of Mrs. Hume and of Douglass. The case is one where two dependent females, sisters-in-law to the trustee, looked to him, leaned upon him, and trusted him to take care of the estate which had been left them by their grandfather. They, of course, were reluctant to believe that their brother-in-law would wrong them, and his repeated promises doubtless kept them from calling him to a settlement in court long ago.

Under such a state of facts, neither the lapse of time nor statute of limitations can avail. The principle settled by this court in *Michoud* v. *Girod*,[*] rules the case. In that case the court, speaking of the acquiescence of parties like the complainants here, say :

"We can only see in their conduct the fears and forbearance of dependent relatives, far distant from the scenes of the transactions of which they complain, desirous of having what was due to them, and suspecting it had been withheld, but unwilling to believe that they had been wronged by brothers with whom they had been associated in a common interest by another brother who was dead. In a case of actual fraud courts of equity give relief after a long lapse of time, much longer than has passed since the executors in this instance purchased their testator's estate. In general, length of time is no bar to a trust clearly established to have once existed; and where fraud is imputed and proved length of time ought not to exclude relief."

[*] 4 Howard, 197.

*Messrs. J. M. Carlisle and J. D. McPherson, contra,* argued:

That the complainants were estopped in the proceeding in the County Court of Prince George's County in December, 1830.

That Beale was trustee of a mere dry legal estate, and that the duties of such trustees are confined to three objects: 1st. To permit the *cestui que trust* to enjoy the estate; 2d. To execute conveyances when necessary; " 3d. To defend the title of *cestui que trust* in any court of law or equity, or at any rate to suffer his name to be used for that purpose."*   " It is not his duty to bring suits, but only to allow his name to be used, and this not until security has been given by the *cestui que trust* for·costs."†

That it could never have been contemplated that Mr. Beale, a young lawyer in Washington City, should act the part of a slave-master and overseer of a farm, twenty miles off.

That so far as evidence of Mr. Beale's misconduct as trustee came from Mrs. Hume, one of the complainants, it should be disregarded as having been received in violation of the act of Congress of March 3d, 1865; while so far as it came from the old slaves, Johnson and Brooks, who naturally wished to testify in favor of their young mistress; it was destroyed by the very witnesses themselves; and that if Mr. Beale ever did bring slave-traders to the farm to buy slaves, it was doubtless to buy his own wife's slaves; those that came from Mrs. Lane, her grandmother, and were on the farm, but were not among those conveyed by old Mr. Berry.

That there was no evidence that Beale ever grew rich, beyond owning a house in which he lived; while it was shown that his wife had some property.

That the testimony of Douglass was sought to be perverted. Consider that testimony. If Mr. Beale was speaking of what he owed Mrs. Hume and Mrs. Crosby, in their own right, he would have used their names, and not have used the name of Berry, which they had laid aside years before;

---

* Hill on Trustees, 316–17.          † Ib.

he would have had no occasion to speak of owing any one named Berry at all. Mr. Beale, "said he had charge of their money, and borrowed it." That was the way in which he owed Miss Rosalie, and that certainly was *not* the way in which he owed the complainants. If he owed *them* anything, it was because he had fraudulently sold their slaves, and not because he had borrowed their money.

That the laches were gross; the lapse of time in connection with the death of the party charged with mal-administration, conclusive. In *Prevost* v. *Gratz*,* this court says:

"Fraud or breach of trust ought not lightly to be imputed to the living, for the legal presumption is the other way; and as to the dead, who are not here to answer for themselves, it would be the height of injustice and cruelty to disturb their ashes, and violate the sanctity of the grave, unless the evidence of fraud be clear beyond a reasonable doubt."

Mr. Justice DAVIS delivered the opinion of the court.

It is undeniable that the waste and misappropriation of property for which relief is sought, occurred prior to 1830.

This is apparent, not only by the testimony of the living witnesses, but by the papers in the suit commenced in the County Court of Prince George's County, Maryland, where the property was situated, in behalf of the children, for whom Benjamin Berry, in his deed, made provision, by their uncle and next friend, for the same cause of action as that comprised in the present suit.

While it is not necessary for the purposes of this case to decide whether this decree can be treated as a former adjudication of the matters in controversy, yet it is quite clear that forty years ago a Maryland court of equity, sitting on the spot where the transactions occurred, while they were fresh in the memory of men, did not believe Beale guilty of the breach of trust with which he was charged, and that the near kindred of the complainants acquiesced in the result of that suit.

---

* 6 Wheaton, 481, 498; and see Pratt *v.* Vatier, 9 Peters, 416; and Knight *v.* Taylor, 1 Howard, 161, 168.

Whether Beale, under the deed of Benjamin Berry, was the trustee of a mere dry, legal estate, or whether his duties and responsibilities extended further, it is not important to determine. In any aspect of the case, there has been such gross laches on the part of the *cestui que trusts* that they have disentitled themselves to the relief which they seek to obtain. It is an established rule with courts of equity, independent of any statute limiting the time in which suits can be brought, that they will not entertain stale demands. This rule is necessary from considerations of public policy, and because it is impossible to do entire justice when the transactions sought to be impeached have become obscure by lapse of time, and the evidence on the subject is liable to be lost. Story, referring to the rule imposing diligence upon parties seeking relief, says: "Hence, if there be a clear breach of trust by a trustee; yet, if the *cestui que trust* or beneficiary has for a long time acquiesced in the misconduct of the trustee, with full knowledge of it, a court of equity will not relieve him, but leave him to bear the fruits of his own negligence or infirmity of purpose."[*]

This rule, requiring the party injured to seek redress in reasonable time, has so often received the sanction of courts of equity in this country and England, that it is unnecessary to cite authorities to sustain it. Whether the lapse of time is sufficient to bar a recovery must, of necessity, depend upon the particular circumstances of each case.[†]

By the terms of the deed in this case, the interest of Mrs. Berry in the property terminated on her marriage or death, and if the eldest child was of age or married, on the happening of either of these events the entire trust ceased, and the trustee was directed to convey the estate, real and personal, to the children and their heirs. It is alleged that Mrs. Berry was married to Owings in 1830. If this were so, it would account for her conduct in converting the personal property to her use, but the evidence on the subject of this

---

[*] Equity Jurisprudence, § 1284.

[†] Harwood *v.* Railroad Co., *supra*, 78.

marriage, although rendering it highly probable that it did occur, is insufficient to establish it.

It is conceded, however, that she was married to Ferguson in 1843, at which time the eldest child was not only of full age, but had been married and was then a widow.  These occurrences, according to the terms of the deed, terminated the trust, but in point of fact it was terminated in 1834 or 1836, when the real estate was sold by order of the Prince George's County Court.  This sale is set up in the answer, and Mrs. Hume testifies that the farm was sold by commissioners appointed by the court, and that her husband, in 1836, received from them in person, her share of the proceeds.  It is in evidence that Mrs. Crosby was married in 1844, and she must have arrived at full age before that time.

It thus appears that all grounds of action, existing in this case, must have occurred between twenty and thirty years ago, and that the alleged breach of trust for which the estate of Beale is asked to account took place thirty-seven years before the institution of this suit.

Why have these complainants slept upon their rights for this great length of time, and why have they delayed invoking the aid of a court of equity until the person charged with misconduct is dead?  It is plain this unusual delay places them on the defensive, and requires satisfactory explanation before they can obtain relief.

It is alleged in the bill as an excuse for not suing earlier that Beale put the complainants off from time to time with promises to settle his trusteeship, and did not deny that he was largely indebted to them on that account.  This allegation receives support only in the testimony of Mrs. Hume, who had no right to testify as to any conversation or transaction with the decedent unless the opposite party or the court wished her to do it.*  This rule of exclusion was imposed by Congress in the interest of dead men's estates, but as the record does not disclose any objection to the competency of the witness her testimony will be treated as if right-

---

* 15 Stat. at Large, 533.

fully given.   She says, in general terms, that she called on
Beale repeatedly to settle, and that he promised to do so,
and that these promises induced her not to sue him.   This
is the extent of her testimony on the subject, and her state-
ment is so general and so obviously necessary to avoid the
bar of the statute of limitations and of lapse of time, which
were pleaded, that it carries little weight with it.   It would
never do to hold that a stale demand of such long standing
could have vitality imparted to it, on the mere statement of
a party in interest that the decedent promised to settle.
There must be some corroborating circumstances to call into
activity the powers of a court of equity, and these are wholly
wanting in this case.   No one was ever present at any of
these conversations, and there is no specification of time or
place, nor does she say that Beale ever admitted any indebt-
edness on account of this trust.   Besides, she never wrote
to him, nor did he ever write to her on the subject, which is
a little remarkable, considering her destitute situation from
1837 to the commencement of this suit.   Indeed, the letters
which she did write to him in 1837 and 1846 are inconsist-
ent with the idea that she thought he intended to defraud
her, which she now says she always entertained.

There is nothing in the record except this testimony that
tends even to show that Beale ever admitted he was charge-
able for the wrongful conversion of the property in question.
He expressly disclaims this liability in the Maryland suit in
1830, and the court could not have rendered the decree it
did without being satisfied at least that he was not person-
ally concerned in the waste of the property.   It is hard to
believe, on the unsupported testimony of a party in interest,
that Beale at different times during a long life confessed a
liability which he repudiated on the occasion of that liti-
gation.

It is a little singular that Beale should have confined his
promises to Mrs. Hume, and not extended them to Mrs.
Crosby.   Mrs. Crosby does not testify, and we do not learn
that either herself or husband, with whom she lived for thir-
teen years, ever manifested disapprobation of Beale's con-

duct.  If the other sister, Rosalie, who died unmarried in 1860, considered Beale had wronged her, she would not have intrusted him, as she did, with the management of her share of the money received from the sale of the farm.

There is one other point in connection with the testimony of Mrs. Hume worthy of comment.  She swears that, in 1834 or 1835, she advised her husband against suing Beale, for the reason that he was poor and nothing could be made out of him, and that her husband used to lend Beale money and supersede his debts for him.  If this be so, the theory on which this case is prosecuted falls to the ground, for the whole effort is to show that Beale got so rich immediately after the conversion of the personal estate that he must have shared the proceeds.  It is argued that the conversations which Beale had with Douglass refer to the obligations arising from his breach of trust, and that, therefore, Mrs. Hume is sustained by the testimony of Douglass.  But manifestly Beale is not talking on this subject; he is talking about the sum of $3000 which Miss Rosalie Berry got from the sale of the farm and placed in his hands to loan.  This money he owed the estate of Miss Berry, and was desirous of paying to her next of kin, Mrs. Hume and Mrs. Crosby.

It is needless to pursue the subject further.  If Beale was guilty of misconduct in his character of trustee, the complainants had full knowledge of it and acquiesced in it for a great length of time, and there is nothing shown in the evidence to overcome the decisive influence of this knowledge and acquiescence.

DECREE AFFIRMED.