NADDO v. BARDON et al.

*(Circuit Court, D. Minnesota. October 16, 1891.)*

1. ACCOUNTING—LACHES—BREACH OF TRUST.
   Plaintiff's attorney, to sell certain land in Minnesota and to pay taxes thereon, conveyed it in plaintiff's name to a third person, and took a reconveyance thereof to himself, bought in an outstanding title arising from an execution sale, and allowed the land to be sold for taxes at various times, and bought in the tax-titles. Thereafter he conveyed the title thus acquired. All this he did with little or no attempt at concealment. Each transaction was recorded, and, in most instances, promptly. During 20 years subsequent to the execution of the power of attorney, and 10 years after the last-named conveyance, plaintiff made no inquiries about the land, paid no attention to it, and furnished no money for the payment of taxes or other expenses. It does not appear that the land was productive. *Held*, that plaintiff was guilty of laches, and could not have an accounting from the attorney, or recover the land from his grantees.

2. SAME—FEDERAL COURTS—STATE STATUTES OF LIMITATION—TRUSTS.
   A suit in a United States court for the district of Minnesota, against said attorney and his grantees, to recover the land, is barred under St. Minn. 1878, c. 66, § 6, subd. 7, which provides that "actions to * * * compel an accounting, when the trustee has neglected to discharge his trust, or has repudiated the trust relation, * * * must be brought within six years;" since United States courts, while not controlled by the law and practice governing state courts, will follow them when justice will be subserved thereby.

3. SAME—EXCUSE FOR DELAY—ABSENCE FROM STATE—POVERTY.
   Neither absence from the state nor poverty or inability to pay the expenses of litigation will excuse the owner's laches.

4. PLEADING—ALLEGING CONCLUSIONS.
   It is not a sufficient averment of the attorney's ability to pay taxes out of the proceeds of the land to allege merely that the land was of great value, and the proceeds were ample, and more, to pay all taxes and expenses, but the facts should be alleged.

**5. SAME.**

An allegation that the land was sold under "a pretended judgment, * * * which was informal, irregular, and void," is not sufficient to raise any question of the validity of the judgment.

In Equity. Bill to recover land, enforce an implied trust, and for an accounting. On demurrer to bill.

The following are the material averments of the bill:

(1) January 1, 1863, complainant obtained patent from the government for the S. W. ¼ of the N. E. ¼ of section 5, township 49 N., range 14, together with other lands. Patent recorded January 26, 1863. Complainant, June 6, 1863, removed to Canada, leaving the property in charge of his nephew, Pierre Etu, as his agent, gave him a warranty deed of the property, intended as a power of attorney, that he might manage the property, stating in the deed $100 as the consideration price. This deed was recorded. July 7, 1864, complainant returned to St. Louis county, Minn. Pierre Etu had then removed to Canada. He reconveyed to complainant by a deed executed in the French language, according to the laws of Canada, not witnessed or acknowledged, according to the laws of Minnesota. This deed was recorded October 21, 1867.

(2) September, 1870, complainant desired to remove to Marquette, Mich. On the 24th of that month executed power of attorney to Richard G. Coburn; recorded May 4, 1874. The right of substitution was contained in the power of attorney, which is attached to the bill as Exhibit A.

(3) Coburn, March 7, 1874, executed a substitution of attorney to James Bardon, which was recorded May 4, 1874. Copy attached to bill as Exhibit B.

(4) Barden, contriving how to defraud complainant, while acting as his agent under the power of attorney, May 13, 1874, quitclaimed this property in the name of Naddo, by himself, as attorney in fact, to John Q. Hubbard, and on the next day, the 14th of May, 1874, Hubbard reconveyed the same property back to James Bardon individually. The consideration price stated in each of those deeds was one dollar, which was the only consideration which passed between them. Both of these deeds were quitclaims. The deed from Naddo, by Bardon as attorney, to Hubbard was recorded May 16, 1874, two days after Hubbard had reconveyed to Bardon; but the deed from Hubbard to Bardon was retained by Bardon unrecorded for over a year, though he had it at the time that the deed by him to Hubbard was recorded, and he only recorded it upon the 4th of June, 1875. A copy of the deed by Naddo, per Bardon, as attorney in fact, to Hubbard is attached to the bill as Exhibit C, and a copy of the deed by Hubbard to Bardon attached to the bill as Exhibit D.

(5) Bardon on May 14, 1875, procured a quitclaim deed of the property in question from Pierre Etu, representing to Etu that there was some defect in the conveyance which said Pierre Etu had made to Naddo July 7, 1864, in French, which should be rectified. On that representation Etu made a quitclaim deed to Bardon. After procuring the quitclaim from Etu, Bardon recorded on June 4, 1875, the quitclaim deed he got from Hubbard, and the one which he got from Etu.

(6) J. D. Ensign brought attachment suit in the district court of St. Louis county against complainant, and obtained a pretended judgment for a small amount, which was informal, irregular, and void. A sale was made by the sheriff of this property on said judgment to John C. Hunter, for the sum of $400; $190.53 being the claim of Ensign. The complainant never received the balance of the $400. Sheriff's certificate of purchase was issued to Hunter and Philip S. Harris March 10, 1873, which was recorded. Hunter as-

signed his claim to the Duluth Savings Bank, which assignment was recorded. Harris quitclaimed his interest to James Bardon for $40, July 15, 1875. June 18, 1876, the savings bank quitclaimed to Bardon for $10. Harris also quitclaimed to Bardon. These quitclaims were all recorded; thus canceling this pretended judgment.

(8) Bardon, June 4, 1875, allowed this property to be sold by the auditor of St. Louis county for back taxes of 1872, and Bardon bid in the tax in his own individual name, he taking a tax-deed to himself for the tax; his power of attorney from the complainant standing uncanceled.

(9) Bardon, while still acting as the agent of complainant, the power of attorney being uncanceled, allowed the said property to be sold in 1878 for the back taxes of 1874, and procured them to be bid off in the name of his sister, Mary Bardon. Bardon also permitted the land to be sold for the back taxes of 1878, and bid the same off in his own name.

(10) Mary Bardon quitclaimed her tax-title to James Bardon September 25, 1879. All of said conveyances of tax-titles were recorded.

(11) The power of attorney by substitution to Bardon still continued upon the record uncanceled, and has so continued until the present time. Nevertheless, Bardon, while being the agent of the complainant, fraudulently and wrongfully contrived to defraud the complainant, and took the deeds from Hubbard, Harris, the Duluth Savings Bank, Mary Bardon, and the tax-deeds referred to, and then assumed, without the knowledge of the complainant, to be the owner of the property in his individual right. The complainant has been absent from St. Louis county since the giving of the power of attorney to Coburn, in Marquette county, Mich., and then in Canada, and has not until recently known of these fraudulent attempts on the part of Bardon. And complainant alleges that, since the making of the power of attorney to Coburn, the property has been of large value, and the proceeds from the use of the same from the very first were ample, and more than ample, to pay all taxes and expenses that could legally be brought against the land, and that the land has steadily increased in value since that time. That at the time of the giving of the power of attorney to Coburn the property was worth at least from $8,000 to $10,000, and it was worth that when Bardon conveyed the same, in the name of the complainant, to Hubbard for $1, and took a deed back to himself for the same amount. Complainant alleges that all this time Bardon has held the title as trustee for him, and that all the outstanding claims against the property which he has procured in his own name he holds as trustee for complainant, and that Bardon has acquired no personal equitable right or title to the property. That Bardon received and continues to hold the said land in trust. That the nature of a trust relation between complainant and Bardon fully appears upon the records of the county where the land lies. That this power of attorney by substitution stands uncanceled or discharged. That Bardon had no power to sell the property in his own name. That the conveyance to Hubbard was fraudulent and void. That complainant has never disposed of, or authorized any one to dispose of, his rights, except under the conditions of the powers of attorney set forth in the bill.

(12) Complainant is informed that Bardon assumed to sell in his own individual name the said property to Henry W. Sage for $2,250, and deeded the same to him on February 4, 1880, which deed was recorded. Henry W. Sage and wife assumed to convey an undivided quarter interest to Sophronia Dean and Joel W. Glode, executors of the estate of Warren H. Dean, and that Glode and Dean, as executors, conveyed an undivided one-quarter interest in the land to the defendant Frederick W. Paine for $2,800. Bardon and wife, November 16, 1885, conveyed by quitclaim to Henry W. Sage for $2,500, and Henry W. Sage conveyed an undivided three-quarters interest to Frederick W. Paine for $7,500, and on June 19, 1886, Paine platted the land into the

West Park division of Duluth, which plat was recorded August 30, 1886. Then follow numerous conveyances to the various defendants in the bill, by quitclaims, special warranty, and warranty deeds,—conveyances of all forms.

(13) In paragraph 13, appearing upon page 42 of the bill, complainant alleges that for the last 10 or 12 years he has resided in Canada; that he has not until quite recently learned of the extent to which this property has been transferred; that for 10 years he has known that James Bardon and others claimed that he had forfeited his rights in the land, and that Bardon refused to account to him for his transactions; that since the learning of Bardon's fraudulent dealings, he has been poor, and unable to pay the expenses of litigation necessary to enforce his rights in the court, and has been unable to procure, until recently, the assistance to enforce his rights.

(14) Complainant offers as to those who have purchased lots and made improvements upon lots in West Park division of Duluth, and who have purchased in good faith, and without actual notice of the rights of your orator, to allow such defendants, for the improvements they have made in good faith, the actual value of the improvements, or to ratify and confirm their title; or that he will accept from such defendants who have made improvements upon portions purchased by them the difference between the amount which they have paid for the property and its improvements and its present value, in settlement of his claim against such portions of the property; and offers to refund to the parties making such permanent improvements the value of the improvements, or to accept from such occupiers the difference in value between the property so actually occupied, and necessarily used in and about such industries, and the present value of said property so used and occupied, in cancellation of his title. Special reference is made to section 14 of the bill as to this offer.

(15) Complainant alleges that he is informed that Bardon has become wealthy by misappropriation of his property; that he has not accounted to him for his doings as trustee; and prays that he be called upon to account.

(16) In this paragraph of the bill comes the prayer for relief, namely, a decree that the land in question belongs to complainant, and that defendants account to the complainant; that James Bardon, Jacob R. Myers, Frederick W. Paine, and Henry Lardner set forth a true account of all their actions and doings in respect to the property, and for the use and occupation of the same; "and that the respective rights of your orator and the said defendants be fully ascertained, and that the defendants may be decreed to pay to your orator what, if anything, shall appear on such account to be due from each of the said defendants, severally or collectively," etc., and then a prayer for general relief.

The defendants have demurred to the bill on the following grounds: (1) Because the bill is multifarious; (2) because the bill does not state such a case, nor contain any matters of equity entitling the complainant to any relief against the defendants.

*H. S. Lord,* (*Clark & Pearl,* of counsel,) for complainant.

*R. R. Briggs,* (*T. C. Ryan,* of counsel,) for defendants Bardon and Day, Merritt & Erickson.

*Walter Ayers,* for other defendants.

THOMAS, J., (*after stating the facts.*) The view I have taken of this case renders the consideration of any proposition advanced, except the laches and acquiescence of the complainant, unnecessary. In arriving at a conclusion, I have had the aid of an oral argument by able counsel,

and have been furnished with full and exhaustive briefs. Does this bill show upon its face that the complainant has been guilty of such laches, and that he has so far acquiesced in the disposition of the property in question, as to warrant this court in withholding any relief? If so, the objection to the bill may be taken by the demurrer. *Maxwell* v. *Kennedy,* 8 How. 222; *Lansdale* v. *Smith,* 106 U. S. 391, 1 Sup. Ct. Rep. 350; *Speidel* v. *Henrici,* 120 U. S. 387, 7 Sup. Ct. Rep. 610. This action was commenced in May, 1891. From the year 1870 down to the time this bill was filed the complainant seems to have given no attention to the property. His attorney was authorized to pay taxes on the land, and to look after the same until it was sold, but it does not appear that his attorney was furnished money with which to pay taxes, or any expenses incident to the care and protection of the property. I do not find any allegations in the bill from which it can be fairly or reasonably inferred that the land was productive, or yielded any revenue whatever. True, there are general allegations that the land from the time of the making of the power of attorney to the filing of the bill was of great value, and that the proceeds from the use of the same from the first were ample, and more, to pay all taxes and expenses that might be legally brought against the land. These averments are mere conclusions, and not issuable facts, properly pleaded, from which any inference as to the proceeds of said land can be fairly drawn. On the other hand, the fair inference, from all the allegations of the bill as to this land, is that said land was uncultivated, unproductive, and in its natural state at the time of the giving of the power of attorney, except about four acres, which were cleared. It was sold on execution in the spring of 1873 for the sum of $400, upon a judgment that, in view of the allegations in the bill respecting the same, must be presumed to be valid. After the year of redemption had expired, the holders of the title to the land obtained through that judicial sale sold their interests therein to defendant Bardon for about $60, and in the year 1880, 10 years after the execution of the power of attorney, Bardon sold the land to Sage for the expressed consideration of $2,250. During all these years the complainant does not appear to have furnished any money to pay taxes on the land, or made any inquiries concerning the land, or given any attention to it whatever. True, he had appointed an attorney to sell the land, to pay taxes, and to protect the land from trespassers. He knew that he had left an obligation behind him, and that this land might, and, in the ordinary course of things, probably would, be subjected to the payment of such obligation. I am strongly impressed with the idea, from the facts alleged, and the natural and reasonable inferences deducible therefrom, that the complainant had ceased to take any interest in the land, or care what had or might become of it. His conduct, the entire want of attention, and the disregard of his interests in it, are inconsistent with any other theory. Prior to the sale to Sage in 1880, the records of the county wherein the lands are situate contained full and fair statements of Bardon's doings in the premises. From these records it then, at least, appeared clearly that Bardon had obtained the complete title in his own

name, so far as conveyances were concerned; that is, he had obtained deeds in his own name to the land. He gave public notice to the complainant and to the world, by these records, that he claimed to be the real and sole owner of that land. The records show that he had for six years prior to the sale to Sage been acquiring, as opportunity offered, title to the land in his own name, without any attempt at concealment, except the neglect to record the deed from Hubbard to himself, from May, 1874, to June, 1875, and, perhaps, allowing one sale of the taxes to be made to his sister, which claim of the sister, however, he obtained in his own name, and put the deed upon the records. Whatever may have been Bardon's secret intentions or motives, with this one exception, with reasonable promptness he spread upon the public records the evidences of his doings concerning the land in question. These records were open to inspection, and accessible to complainant. For a mere pittance he could have ascertained all the facts appearing upon these records, wherever he might have been. Conclusive evidence of unqualified repudiation of his trust by Bardon was then reasonably accessible to complainant. Bardon not only obtained the complete title in his own name, but, after doing so, in 1880, he sells and deeds all the land to Mr. Sage, and that deed is spread upon the public records in the ordinary course of business. This land has been platted, divided and subdivided, and conveyed, in blocks and lots, to various parties, who are made defendants in this action, many of whom have made valuable improvements on the property. Complainant, admitting the long delay, attempts to excuse it, so as to bring his case within the equitable rule, requiring him to set forth in his bill what were the impediments to any earlier prosecution of his claim. In this regard he alleges:

"And your orator alleges that for about ten or twelve years last past he has resided in Canada, and that the transfers of the property of your orator, as previously set forth, and as appear by the records of the register of deeds for said county, have been made without the knowledge and consent of your orator, and your orator has not until quite recently learned of the extent to which such transfers have been made. And your orator further alleges that for about ten years he has known that the said James Bardon and others claimed that he had lost or forfeited his rights to the said land, and that the said Bardon refused to account to him for his transactions with regard to the same, but your orator has, during all said time since learning of such wrongful and fraudulent dealings on the part of the said James Bardon, been poor, and unable to pay the expense of litigation necessary to enforce his rights in the courts, and has been unable to procure, until recently, the assistance necessary to enforce his rights."

Just when he obtained, according to his own claim, full and complete knowledge of all the doings of Bardon does not appear. The allegation that he only recently acquired such knowledge is too vague and uncertain to demand the consideration of this court.

*Case of Broderick's Will*, 21 Wall. 519:

"Absence from the state cannot avail. Parties cannot thus, by their seclusion from the means of information, claim exemption from the laws that control human affairs, and set up a right to open up all the transactions of the

past. The world must move on, and those who claim any interest in persons or things must be charged with knowledge of their *status* and condition, and of the vicissitudes to which they are subject. This is the foundation of all judicial proceedings *in rem.*"

Allegations of general ignorance of things, the knowledge of which is easily ascertainable, is insufficient to set into action the remedies in equity. *McQuiddy* v. *Ware*, 20 Wall. 14. Nor upon well-settled equitable rules can his plea of poverty and inability to pay the expenses of litigation necessary to enforce his rights avail him in this action.

In *DeEstrada* v. *Water Co.*, 46 Fed. Rep. 282, the court says:

"The complainant is an ignorant woman, unable to read or write in any language, and has heretofore been too poor to employ a counsel or prosecute her rights. While the poverty of the complainant is much to be regretted, it does not constitute any legal or equitable ground for granting her relief which would be denied to her if rich. The legal and equitable rights of parties to controversies before the courts must be administered regardless alike of poverty and riches. Nor is the fact that complainant is ignorant and unable to read or write of itself sufficient to bring into action the aid of a court of equity in behalf of a claim and demand otherwise barred by lapse of time. Every one not under legal disability must assert his or her rights within the time prescribed by the rules of law or equity, as the case may be. It is true that the statutes of limitations applicable to actions at law do not apply to suits in equity, but courts of equity are governed by the analogies of such statutes."

In view of the well-settled principles of equity jurisprudence to the contrary, I cannot hold that the alleged excuses of complainant for his neglect to earlier prosecute his claim and assert his right are sufficient.

The contention of the counsel for the complainant is that lapse of time is no bar to a subsistent trust in real property. His argument is:

"It appears that James Bardon became the agent of Pierre Naddo March 7, 1874, under a power of attorney previously given to Richard G. Coburn, and by Coburn substituted to Bardon. Bardon, on the 13th day of May, 1874, quitclaimed the property in question to John Q. Hubbard, and upon the next day, the 14th day of May, Hubbard quitclaimed the same to James Bardon personally. Bardon, also, May 14, 1875, the next year, procured a quitclaim deed from Pierre Etu to himself, evidently to cover the defect in the record appearing from the failure of Pierre Etu in reconveying to Naddo July 7, 1864, in making a proper acknowledgment, and having the paper duly witnessed, so as to entitle it to record in Minnesota, and make it notice to all. Bardon also took quitclaim deed from Philip S. Harris, one from Duluth Savings Bank, and one from Mary Bardon of execution, purchases, and tax-titles on the property. All of these conveyances he took to himself, while he held the power of attorney from Pierre Naddo uncanceled, and without any notice to Naddo that he ignored the power of attorney, and would surrender the same, and refused to act under it longer. It further appears that James Bardon, having thus procured a conveyance of outstanding clouds upon the title of Naddo to himself, February 4, 1880, assumed to sell the property, and give a warranty deed of the same to Henry W. Sage. This conveyance was clearly a fraud upon Naddo, and void; as all of these outstanding conveyances to Bardon, received while he held the power of attorney from Naddo, were taken in the law and in equity for the benefit of Naddo."

His theory is that, during all this time, the relations of trustee and *cestui que trust* existed between the parties, and that whatever Bardon did was, in equity, in behalf of and for the complainant, and that he is now entitled to an accounting and to a decree removing the clouds from the property, and that he be declared the legal and actual owner of the property.

Upon the conceded facts of this case, I am unable to give my full assent to the contention of the learned counsel for the complainant. It is true that the power of attorney remained uncancelled on the records, but Bardon caused to be spread upon these same records most emphatic, open, and distinct disavowals of the trust. He not only took all deeds in his own name, but in 1880 he openly sold and conveyed the land to Sage in his own name. Complainant says that not until quite recently did he learn of the extent to which these transfers were made. He knew that they were being made, and that Bardon was dealing with the property in his own name; that he was asserting rights to that property inconsistent with his duties as trustee, and antagonistic to the interest of the complainant. He admits that for 10 years he had known that James Bardon and others claimed that he had lost or forfeited his rights to the land, and that the said Bardon refused to account to him for his transactions with regard to the same.

In view of the facts that the records were open and accessible to the complainant; that these records contained the most indubitable evidence of the disavowal and repudiation of the trust on the part of Bardon; that the complainant had been advised for over 10 years of the facts which he admits, and above quoted,—I think I am bound to hold that not only Bardon repudiated and denied the trust more than 10 years before the commencement of this suit, but that such disavowal of the trust was clearly and unequivocally made known to complainant at least 10 years before this bill was filed. If he was not fully advised during all these years of the extent of Bardon's doings in the premises, and the full extent of the transfers, he had the ready means of ascertaining all these facts. They were easily and readily accessible, and the possession of such means of knowledge, in equity, is the same as knowledge itself. *New Albany* v. *Burke*, 11 Wall. 96–107; 2 Story, Eq. Jur. § 1521. The supreme court of the United States has recently spoken upon this question, and I quote at length from the opinion of Justice GRAY, speaking for the court in *Speidel* v. *Henrici*, 120 U. S. 386, 7 Sup. Ct. Rep. 610, as follows:

"As a general rule, doubtless, length of time is no bar to a trust clearly established, and express trusts are not within the statute of limitations, because the possession of the trustee is presumed to be the possession of his *cestui que trust*. *Prevost* v. *Gratz*, 6 Wheat. 481, 497; *Lewis* v. *Hawkins*, 23 Wall. 119, 126; *Railroad Co.* v. *Durant*, 95 U. S. 576. But this rule is, in accordance with the reason on which it is founded, and as has been clearly pointed out by Chancellor Kent and Mr. Justice Story, subject to this qualification: that time begins to run against a trust as soon as it is openly disavowed by the trustee, insisting upon an adverse right and interest which is clearly and unequivocally made known to the *cestui que trust;* as when, for instance,

such transactions take place between the trustee and the *cestui que trust* as would, in case of tenants in common, amount to an ouster of one of them by the other. *Kane* v. *Bloodgood*, 7 Johns. Ch. 90, 124; *Robinson* v. *Hook*, 4 Mason, 139, 152; *Baker* v. *Whiting*, 3 Sum. 475, 486; *Oliver* v. *Piatt*, 3 How. 333, 411. This qualification has been often recognized ·in the opinions of this court, and distinctly affirmed by its latest judgment upon the subject. *Willison* v. *Watkins*, 3 Pet. 43, 52; *Boone* v. *Chiles*, 10 Pet. 177, 223; *Seymour* v. *Freer*, 8 Wall. 202, 218; *Bacon* v. *Rives*, 106 U. S. 99, 107, 1 Sup. Ct. Rep. 3; *Phillippi* v. *Phillippe*, 115 U. S. 151, 5 Sup. Ct. Rep. 1181. * * * Independently of any statute of limitations, courts of equity uniformly decline to assist a person who has slept upon his rights, and shows no excuse for laches in asserting them. 'A court of equity,' says Lord CAMDEN, 'has always refused its aid to stale demands, where the party slept upon his rights, and acquiesced for a great length of time. Nothing can call forth this court into activity but conscience, good faith, and reasonable diligence. Where these are wanting, the court is passive, and does nothing. Laches and neglect are always discountenanced, and therefore, from the beginning of this jurisdiction, there was always a limitation to suits in this court.' *Smith* v. *Clay*, 3 Brown, Ch. 640, note. This doctrine has been repeatedly recognized and acted on here. *Piatt* v. *Vattier*, 9 Pet. 405; *McKnight* v. *Taylor*, 1 How. 161; *Bowman* v. *Wathen*, Id. 189; *Wagner* v. *Baird*, 7 How. 234; *Badger* v. *Badger*, 2 Wall. 87; *Hume* v. *Beale*, 17 Wall. 336; *Marsh* v. *Whitmore*, 21 Wall. 178; *Sullivan* v. *Railroad*, 94 U. S. 806; *Godden* v. *Kimmell*, 99 U. S. 201. In *Hume* v. *Beale*, the court, in dismissing, because of unexplained delay in suing, a bill by *cestui que trust* against a trustee under a deed, observed that it was not important to determine whether he was the trustee of a mere dry legal estate, or whether his duties and responsibilities extended further. 17 Wall. 351. See, also, *Bright* v. *Ledgerton*, 29 Beav. 60, and 2 De Gex, F. & J. 606."

I am ·of the opinion that this action could not be maintained in the courts of this state, by reason of the fact that the claim set up in the bill is barred by the statute of limitations. St. Minn. 1878, c. 66, § 6, subd. 7: "Actions to enforce a trust or compel an accounting, where the trustee has neglected to discharge his trust, or has repudiated the trust relation, or had fully performed the same, must be brought within six years." The supreme court of the state of Minnesota in *Burk* v. *Association*, 40 Minn. 506, 42 N. W. Rep. 479, have held .that the statute covers implied trusts. I see no distinction in the statute, and am of the opinion that it applies to a trust of the nature set up in the bill, and for that reason this suit could not be maintained i·n the state courts. If I am corréct in this, the title of defendants rests secure, under the laws of the state, in the state courts. While the state cannot control the equity jurisprudence of the United States courts, yet when these courts, administering justice in the same state, can see that justice will be subserved by following the rule adopted in the state courts, or by the legislature, they ought to, and generally will, follow the law and rules of the state courts. These courts, acting upon the broad principles of equity, follow the analogy of the law generally. Equity always discountenances laches, and holds that laches is presumable in case where it is positively declared at law. But, acting upon the special facts and circumstances of each case, it will sometimes grant relief where the law would not, and withhold relief where the law would aid.

Upon the facts and allegations, and the natural and legitimate inferences deducible therefrom, upon clear principles of equity jurisprudence, as construed by the supreme court of the United States, I think the complainant must be deemed to have acquiesced in the transfers to the various defendants now holding the title, and to have slept upon his rights in respect thereto. He had full knowledge, or was bound to know, that this property was being transferred, disposed of, occupied, and improved from the time the land was conveyed to Sage, and during all that time he has expressed no disapproval, but by his actions he has acquiesced; and now he must be held to be precluded from obtaining relief in this court as against the defendants holding the title, or any portion of the title to the land in question, upon the principles of, and in analogy to, estoppel. As to the said Bardon, for the reasons heretofore given, and upon the special facts and circumstances of the case, and the rapid developments going on in the progressive city where this land is situate, I think the complainant must be held to have been guilty of such laches as to induce this court to withhold relief. The conclusion is almost irresistible that the complainant might, and he perhaps would, have continued to sleep quietly and peacefully upon his supposed rights, had it not been for the quickening influences that have, within a comparatively recent period, materially appreciated the value of this property, and brought it into prominence.

The demurrers on the part of all the defendants must be sustained, and judgment, dismissing the bill, must be entered, and it is accordingly so ordered.