## YANESON v. DZUS.
### Civil Action No. 1786.

District Court, E. D. New York.
Nov. 27, 1941.

Beekman, Bogue, Stephens & Black, of New York City (Edward K. Hanlon, of New York City, of counsel), for plaintiff.

Robbins, Wells & Walser, of Bay Shore, N. Y. (Isidor J. Kresel, of New York City, Fullerton Wells, of Bay Shore, N. Y., and Wm. Peyton Marin and Daniel H. Kane, both of New York City, of counsel), for defendant.

GALSTON, District Judge.

The plaintiff seeks an accounting from the defendant based on an alleged oral agreement made some time between January, 1931, and September 15, 1931, in respect to the patenting and exploitation of

an alleged invention of the plaintiff concerning a fastener device.

It is asserted that the agreement provided that the plaintiff should turn over his invention to the defendant who should procure the issuance of United States letters patent; that the defendant should have the management of the joint venture and the direction of the exploitation of the invention; that such management and direction were to be exercised for the benefit of the two parties, and that all of the "income, issues, profits and proceeds of the said joint venture" should be divided equally between them. It is alleged that pursuant to the agreement plaintiff turned over the invention to the defendant, that the defendant procured the issuance of letters patent, exploited the invention and has received substantial profits, but has refused to render the plaintiff an accounting.

The defendant denies the making of the agreement and alleges as affirmative defenses the statute of limitations and laches.

■ The complaint was filed on January 15, 1941, and the first demand made by the plaintiff was in his letter of November 20, 1940; thus the approach to a consideration of the case is heavily weighted with the reflection that an oral agreement, creating rights which remain unasserted over a period of ten years, must be rigidly scrutinized.

The plaintiff was employed as a tool and die maker by the Kolster Radio Company or its successor, the Federal Telegraph Company, from March 29, 1929, until January 22, 1930; and again from September 17, 1931, until November 5, 1931, and from November 16, 1931, until October 13, 1932.

It appears that plaintiff purchased a radio receiving set from the Kolster Radio Company during the time of his employment. To correct faulty reception he found he could control the distortion by placing a finger on the resistance coil. To do so it was necessary for him to open the screen door on the reverse side of the radio cabinet. The fastening of this screen partition was effected by two wing nuts. He said on one occasion he placed these nuts on a chair and that his children misplaced them. To replace them he devised the fastening screws which form the subject matter of this litigation.

It is at this point that the plaintiff's story becomes somewhat fantastic, for the instruments devised to effect the simple result which he had in view are unduly complicated. He made the two screws during after-hour periods in the shop of the Kolster Radio Company with the assistance of two fellow workmen, requiring eight hours of work in all over a period of two weeks. With the screws completed the plaintiff says he made two springs and four steel plates to hold the screws in place, and two boards to demonstrate to his foreman how the device operated. The spring was a wire which was fastened to one of the boards with two eye ends through which he could drive a nail or screw. It is significant that he never used these screws. He put them away in the bottom of the radio cabinet where they lay for about a year, and then later were put by some unidentified person in a junk box where they remained until the end of 1940.

It is difficult to believe that Yaneson made these screws for the radio cabinet. In the first place, the screen door fitted into the cabinet so tightly as to remain closed without screws. Again, when the radio cabinet stood against the wall, the door could readily be held in closed position. Moreover, there were simple, cheap devices available on the market for holding the door in closed or open position. The inference is fairly warranted that reference to the radio cabinet was made only for the purpose of establishing a date of conception. Thus Yaneson sought to fix the fall of 1929 as the time of his alleged invention. No blue print, sketch or indeed any written evidence in support of his testimony was offered. The evidence though establishes his contention that he made these devices, for he is corroborated by Carlson, the foreman of his shop, and by Robertson, a fellow worker. The testimony of a second fellow worker, Zolto, was not so convincing. But proof of the time of making is another matter. These witnesses relied solely on their memories. Nothing they said justifies the conclusion that the devices were made in 1929 rather than in 1930 or 1931.

Carlson was the plaintiff's foreman, not only in 1929 but also in 1930, 1931 and 1932. He, said that the purpose for which the screws were made was to save loss of time in attaching and detaching soldering fixtures from the work benches in the plant. Carlson's affidavit, made before trial, recites that he employed Yaneson for approximately three years, and that "during

the years 1929, 1930" he observed that after working hours Yaneson was developing a screw to eliminate loss of time for attaching and detaching fixtures to and from the benches. "The screw consisted of a shank and at one end of the shank were coupled diametrically opposed slots (cam-like) and approximately one quarter of a turn, and at the other end there was a pin by which the shank was turned and the opposed slots were to engage a spring wire, and by twisting the shank the spring was to slide on the cams and compress the articles which were positioned between the spring and the other end of the shank." This description of the use to which the screws were to be devoted explains why plaintiff failed to take measurements of his radio cabinet prior to commencing work on the screw and likewise explains the two undercuts which served no useful purpose whatsoever for adjustment to the radio cabinet.

Robertson was under the impression that he did not work for Kolster or its successor between December, 1929, and 1934, yet the records of the Federal Telegraph Company, successor corporation, show that after having been laid off on January 22, 1930, he was re-employed on June 3, 1931, laid off on July 18, 1931, re-employed July 27, 1931, and laid off November 22, 1932, and re-employed on September 22, 1933, to May 8, 1936. This record is in entire contradiction of his testimony that after leaving Kolster or its successor, Federal, in 1929, he did not resume work until 1934. I have no doubt that the witness intended to be accurate and certainly sought to be honest, but it is another instance of the fragility of memory and the difficulty after a lapse of years in fixing a date, which at the time of the happening of the event had no special significance.

■ The burden, of course, is upon the plaintiff to fix the date of his alleged invention, and testimony of the plaintiff and of those whom he called to support his story do not meet the required test. Carlson's memory on dates also proved faulty. Neither Carlson nor Robertson nor the plaintiff is supported by any written memorandum in respect to the date of the alleged invention. Zolto's testimony certainly adds nothing. He testified indeed that he worked on one of the screws, but Carlson said that he saw only Robertson working thereon.

■ It is, of course, elementary in patent law that an alleged prior use or conception must be established by clear and convincing evidence. Coffin v. Ogden, 18 Wall. 120, 21 L.Ed. 821; Washburn & Moen Manufacturing Co. v. Beat 'Em All Barbed-Wire Co., 143 U.S. 275, 12 S.Ct. 443, 36 L.Ed. 154; H. J. Heinz Co. v. Cohn, 9 Cir., 207 F. 547. Yaneson does not meet this test. Yaneson says that he showed Dzus his fastener in the early part of 1930. This Dzus denies and indeed contends that he showed Yaneson his own device in December, 1930, on the occasion of a visit that Yaneson paid to Dzus in the latter's home at West Islip.

■ The Dzus patent on the fastening device which Yaneson claims he invented was issued on April 24, 1934. He had filed an application on September 15, 1931, which was allowed in 1933. Owing to his failure to pay the final fee, the allowance lapsed and in consequence he was compelled to file a renewal application on June 21, 1933. His date of filing, September 15, 1931, establishes a prima facie date of invention, which he readily carried back to some time in December, 1930, when he was working for the Fairchild Aeroplane Company as a tool maker. The evidence discloses that that company required fasteners for cowlings on planes. The device then in use consisted of a stud and pin. It was found to be unsatisfactory and the company invited suggestions from its employees. Dzus aided in the solution of the problem. Having previously conceived a Ford crank handle rachet, he adapted the principle to the making of a spring for substitution of the slip which one of the Fairchild engineers had devised. Dzus's first sample was conceded by the plaintiff to have been made in the latter part of 1930. Thereafter he made an improved model and additional samples were presented to the officials of the company. Apparently he had solved the company's problem and they desired to acquire rights in the device. On Dzus's refusal to assign such rights he was discharged in July or August of 1931.

■ Whether Yaneson devised and showed his fastening device to Dzus before Dzus developed the device for the Fairchild Aeroplane Company is at the very best aspect of the plaintiff's case a matter of doubt. It is true that Panas, a plaintiff's witness, said he was present at a confer-

ence between Dzus and Yaneson in the early part of 1931, and that at that conference the plaintiff showed him the fastening device. If that was so it is curious that the plaintiff when he testified concerning that conference said nothing about having exhibited the device to Panas. So also as between the testimony of Panas concerning a talk that he had with Dzus in 1935 about the screw which the defendant was then manufacturing and Dzus's version of the talk, on the basis of credibility I must accept the latter.

The plaintiff's case is attended with other infirmities. For even assuming that the plaintiff was the prior inventor, did he enter into an agreement with Dzus, and if so, what were the terms of the agreement? It is not unnatural, after the lapse of so many years, that the matter is not definitely described by the plaintiff or his wife. The bill of particulars alleges that the parties to this law suit associated themselves in a "joint venture" for the purpose of patenting and exploiting the plaintiff's fastener device, and that the conditions of the venture were that the plaintiff turn over his invention to the defendant; that the defendant procure United States letters patent; that the defendant have management of the joint venture and that all the income or profits be divided equally by the parties.

At the trial the plaintiff's version was this: "When I came home Mr. Dzus was already in my home. * * * I pulled out an envelope, my pay envelope, and I handed it to my wife. Mr. Dzus he got up from the chair and he took the envelope * * * opened it and he pulled out $40. and my wife was just looking at what it was all about. He handed it to her back and she said: 'What is that?' and he said: 'Never mind what is that, we are going to patent my screw and whatever comes out of it we are going to take fifty fifty and I am going to try and sell it or work it up.' And she said: 'You with your patents, and all the time you do something and you don't do nothing, and now you drag him in.' And she said: 'How can I live on the money that you have left me?' And he said: 'Well, I manage to live on about a dollar a week. You can manage to live on eight dollars a week. If not, go out and borrow it.'" When the plaintiff's wife testified, her version was not quite the same. She said: "He took out all of it and then he said he needed it, and I didn't know for what, so I asked my husband and him, 'What is it for?' So they told me that it was for the screw, that Mr. Dzus will try to do something with it, * * * and he will give him a half." Incidentally it may be observed that the wife was unable to recall that the plaintiff showed the fastener to Dzus.

It is undisputed that from time to time the plaintiff and the defendant borrowed money from each other—small sums—and the incident related just referred to may very well have been on one of those occasions when Dzus borrowed from the plaintiff. Indeed it does seem that if money passed on that occasion it was a loan and not money advanced to defray the expenses of a patent application. Dzus admits having borrowed forty dollars from Yaneson but states that this occurred late in 1932 or early in 1933, and that it had nothing to do with the question of procuring a patent. This loan was repaid, twenty-five dollars shortly thereafter and the balance on October 30, 1933. In acknowledgment by letter of a payment of this balance and of a small loan from Dzus, it is significant that Yaneson made no reference to the alleged contract between the parties. At that time Yaneson knew that Dzus was manufacturing the fastener. So also the subsequent employment of Yaneson by Dzus in the Dzus factory on a wage basis from May, 1935, to January, 1936, is inconsistent with Yaneson's present claim. During all of that time the plaintiff was aware that Dzus was producing the patented fastener, bearing the patent notice. Again inconsistency appears in his subsequent conduct for he sought and obtained a patent on a fastener which he asserted was better than Dzus's. His application for this patent was filed on December 15, 1937, and the patent issued March 28, 1939. There is nothing to show that Yaneson at that time or any time prior thereto contended that the Dzus patent covered the Yaneson invention and was fraudulently obtained.

Thus the conduct of the parties over the long period up to the time of making the demand herein cannot be reconciled with the plaintiff's alleged cause of action.

Finally, assuming that such an agreement was entered into, it would appear that Yaneson slept on his rights. He stood by idly with full knowledge of the

manufacturing operations as early as 1932 and of the issuance of the patent in May, 1935, when he started to work for Dzus, without asserting any claim. Meanwhile the defendant, without notice or knowledge of any such claim by the plaintiff, devoted his time and ability to the considerable development of his business. Yaneson does not establish any good reason to excuse his failure to assert his alleged rights during that long period of time. True he was a rather ignorant person. Nevertheless in all the circumstances of this case it must be concluded that Yaneson waited an unreasonable time and is not now entitled to redress. Hume v. Beale's Executrix, 17 Wall. 336, 84 U.S. 336, 21 L.Ed. 602; McKnight v. Taylor, 1 How. 161, 42 U.S. 161, 11 L.Ed. 86; Whitney v. Fox, 166 U.S. 637, 17 S.Ct. 713, 41 L.Ed. 1145; Patterson v. Hewitt, 195 U.S. 309, 25 S.Ct. 35, 49 L.Ed. 214.

Whether the defense of statute of limitations has been sustained is doubtful for so far as the record discloses Yaneson was not aware of the issuance of the Dzus patent until May, 1935, and this action was commenced before the expiration of the six year period of limitation.

Inasmuch as the plaintiff has failed to establish his cause of action, the complaint will be dismissed.

Submit findings of fact and conclusions of law in conformity with the foregoing opinion.