GENERAL ELECTRIC CO. v. BULLOCK ELECTRIC MFG. CO. et al.

(Circuit Court of Appeals, Sixth Circuit. March 21, 1907.)

No. 1,566.

1. PATENTS—INVENTION—FUNCTIONS NOT SPECIFIED.
    It is not necessary for a patentee to describe in detail all the beneficial functions which he claims will result from his invention; but it is enough if such functions are evident and obviously contribute to the success of the invention, and they may in such case properly be taken into account in estimating its novelty and utility.

2. SAME—TRANSFER OF DEVICE TO NEW ART.
    The relation between the mechanical and electrical arts is not so close that the adaptation of a known mechanical device to a new use in an

electric motor may not involve invention, where the result is an improvement over prior constructions of great utility and success.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, §§ 31, 32.]

**3. SAME—ELECTRIC MOTOR.**

The Parcelle patent, No. 463,704, for an improvement in an electric motor and dynamo, which consists of means for detachably fastening a laminated pole piece to the solid yoke, covers an improvement of utility and great commercial success, which involved magnetic and electric, as well as mechanical, problems, and was not anticipated, and involves invention; also *held* infringed.

Appeal from the Circuit Court of the United States for the Western Division of the Southern District of Ohio.

For opinion below, see 146 Fed. 552.

W. K. Richardson, for appellant.

Thomas F. Sheridan and Clifton V. Edwards, for appellees.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

RICHARDS, Circuit Judge. This was a suit in equity brought by the General Electric Company against the Bullock Electric Manufacturing Company and others, for an injunction, with the usual prayer for an accounting, for the infringement of claim 1 of letters patent No. 463,704, issued November 24, 1891, to Albert L. Parcelle, the assignor of the complainant, for improvements in an electric motor and dynamo. The answer set up want of novelty and invention and denied infringement. The court below in a short opinion held that patentable invention was not shown and dismissed the bill. From this decree an appeal has been taken.

The Parcelle invention in suit relates to the field magnet of a dynamo and provides a method of firmly fastening the laminated pole piece to the solid yoke thereof. A dynamo consists of two parts, the field magnet and the armature; the one being rotated and the other stationary. In the stationary field machine the armature is rotated within the field magnet, while in the revolving one the field magnet is rotated within the armature. The field magnet consists of a yoke and pole pieces, the number of the latter varying, but being alternately north and south; the magnetic lines of force being projected from the tip of one pole through the armature core back into the tip of the adjacent and opposite pole, and thence through the yoke to the first pole. As the conductors on the surface of the armature move through these lines of force, a current of electricity is generated. The armature is, of course, not in contact with the pole pieces of the field magnet, since the latter must rotate within the former, or the reverse, in order to generate electric energy. Yet at the same time the air gap which separates the two must be kept very small, in some cases not wider than one-eighth of an inch, in order not to interfere with the magnetic circuit. This intimate proximity of the pole pieces to the armature necessarily calls for careful and precise construction and adjustment of the former with respect to the latter. Early in the history of the art, as early as 1879, it was found to be desirable to use toothed arma-

ture cores, and it was then ascertained that, in order to avoid Foucault or Eddy currents in the field magnet pole pieces, it was necessary to laminate the latter. This necessity, however, did not extend to the yoke of the field magnet. It was cheaper and equally effective to keep it of solid iron. The problem, then, was to fasten the laminated pole piece firmly and rigidly to the solid iron yoke, so as to subserve all magnetic and electric requirements, resist all centrifugal and magnetic strains, permit the ready removal of the pole piece sidewise for repairs, and secure and preserve an expanded tip.

The court below, in its opinion, sought to limit the requirements of the problem solved by Parcelle to those of a purely mechanical nature. True, there was a mechanical problem, the firm fastening of the laminated pole piece to the iron yoke; but it was complicated by certain magnetic and electric conditions. These conditions brought about the necessity of the laminated pole piece, and the mechanical problem of fastening it to the yoke was varied by the magnetic and electric requirements to be subserved. The pole piece had to be laminated, yet each laminæ had to be clamped to the yoke so as to make a good magnetic joint. It was desirable to make the pole piece removable, in order to be able to use an expanded pole tip; and the side pieces could not in all cases be made thick enough to receive the bolts to hold the pole piece to the yoke without interfering with the magnetic and electric requirements of the problem. Before the necessity of laminating the pole pieces was known, solid pole pieces were attached to the yoke by bolts or screws. These pole pieces were readily removable sidewise. But with laminated pole pieces it became impracticable to do this, although the Dresskell patent, granted January 27, 1891, shows a method of tapping a bolt directly into the laminated plates; but this was a defective method, because of the fragile nature of the laminæ.

Prior to the invention in suit, either the pole pieces were made integral with the yoke, and both laminated, as shown in the Jablochkoff, Zipernowsky, Schmidt, and other patents, or by casting the yoke around the laminated pole pieces, as in the Schmidt patent of December, 1889, or by bolting the side plates of the pole piece to the core, they being thickened for that purpose, as in the Storey patent of 1890. None of these methods of fastening the pole piece to the yoke was esteemed successful. Laminating both the pole piece and the yoke was expensive, and the pole piece was integral with the yoke. The pole piece could not always be cast firmly within the yoke, and, besides, was irremovable; and to place the bolts in the side plates made them too thick and interfered with the preservation of the proper magnetic and electric conditions. Parcelle solved the mechanical problem of detachably fastening the laminated pole piece to the solid yoke by anchoring into the laminated plates a supporting bar, into which the bolts which held the pole piece to the yoke were firmly screwed. We insert here figures 1 and 3 of the Parcelle patent, which, taken in connection with the appropriate extract from the specification, which follows, sufficiently explains the patented structure:

*Fig. 1, Parcelle Patent.*

*Fig. 3. Parcelle Patent*

"The field, magnet cores, B, are made up of thin plates, d, punched out of sheet iron. The shape of the plates is seen in Fig. 1, where it will be seen that they are formed with polar extensions, $d^1$, and with similar extensions, $d^2$, at the read end. The front edges of the plates are curved to conform to the armature, and the rear edges are curved to conform to the turned or bored interior of the yoke, $A^2$. Each plate is formed with a rectangular hole, C, towards the end of the plate next to the yoke, and smaller holes, c, are formed in the polar extensions. The outer plates, D, of the assemblage of plates forming a core, are made relatively thick, as shown. The plates are insulated, by varnishing, or by the use of thin sheets of paper, or in any of the usual ways, and are secured together by rivet bolts passed through the holes, c, and by a rivet bar, $C^1$, passed through the rectangular hole, C. The field magnet coil, E, may now be wound upon the core, the extensions, $d^1$, and $d^2$, forming seats for the wire. The rivet bar, $C^1$, which is preferably of iron, is provided with two screw-threaded holes, and holes are tapped through the yoke and into the rear end of the core, coinciding in alignment with the screw-threaded sockets in the bar, $C^1$. Bolts, F, having threaded ends, pass through the apertures in the ring and screw into the sockets in the bar, $C^1$. The extensions, $d^2$, furnish a large area of contact and a good magnetic connection between the core and yoke. The small holes through the polar extensions, $d^1$, do not materially reduce the plates at those points, as the iron is wider at the ends of these extensions."

Claim 1, the only one in suit, reads as follows:

"1. The combination, with the yoke, of a laminated core, the bar, $C^1$, passing through the laminations of the core, and a securing bolt or bolts passing through the yoke and into said bar."

By referring to the claim it will be perceived that it consists of (1) the yoke, (2) the laminated core, (3) the supporting bar, and (4) the bolt or bolts fastened through the yoke and into the bar. In this way Parcelle provided a method of fastening a laminated pole piece to the solid yoke, so that, while it could readily be removed sidewise, it was so firmly clamped against the yoke as to form a good magnetic joint, and at the same time so strong that it was able to resist all centrifugal and magnetic forces. The invention went into wide use. Mr. Reist, the designing engineer of the General Electric Company, estimates that that company, at the time he was examined as an expert, had employed the Parcelle invention in at least 20,000 pole pieces.

But it is insisted that, in supporting the usefulness and novelty of his invention, the patentee will be restricted to those beneficial functions which are described in the patent, and will not be permitted, in construing the patent, to rely upon functions which are not described, but merely contended for as evident. It does not follow that, because the patentee did not state all the advantages of his invention, he was ignorant of them. But if he was, yet if those advantages were really present, they might properly be taken into account in estimating the novelty and utility of the invention. In a number of opinions of this court it has been held that it is not necessary for the patentee to describe in detail all the beneficial functions which he claims will result from his invention. It is enough if those functions are evident and obviously contribute to the success of the invention. McCormick Harvesting Machine Co. v. Aultman Co., 69 Fed. 371, 378, 16 C. C. A. 259; Goshen Sweeper Co. v. Bissell Carpet Sweeper Co., 72 Fed. 67, 74, 19 C. C. A. 13; Dowagiac Mfg. Co. v. Superior Drill Co., 115 Fed. 886, 894, 53 C. C. A. 36; Goodyear Tire Co. v. Rubber Tire Wheel

Co., 116 Fed. 363, 375, 53 C. C. A. 583; Stilwell, etc., Co. v. Eufaula Cotton Oil Co., 117 Fed. 410, 415, 54 C. C. A. 584. It is quite impossible to read the description of the invention without observing that each particular part may serve some useful purpose in the electric art, although no claim in this regard is made. Thus the field magnet cores or pole pieces are laminated. The patent does not explain why, but the prior art does. The pole pieces are provided with polar extensions. For what purpose is partly explained and partly evident. And so with regard to each part of the description of the device as set forth in the specification. It is not a purely mechanical device. The mechanical features are designed to subserve magnetic and electric requirements.

This brings us to the defense made for want of invention, which was sustained by the court below. That court, in its short opinion, held that in the light of prior art there was no question of interference with prevailing electric and magnetic requirements; that the only problem to be solved was how to provide a stronger, more rigid, more reliable union between the yoke and the core, which was merely one of mechanical construction. This the court held had been solved by transferring from the mechanic arts a well-known device employed in practically the same manner by Dodge in a pulley-covering device, in his letters patent No. 348,270, dated August 31, 1886. It was held that the existence of Dodge's device was within the knowledge, and its transference within the capacity of the skilled mechanic, without invention. The Dodge patent is only one of a number of patents from the remote arts, not concerned with the construction of dynamos or other problems of electric engineering. They are all methods of fastening one element to another by means of a device anchored in one of the elements in which the method of fastening is effected. Thus, in the Knipe patent of 1842, a bedpost is attached to the rail by a bolt which screws into a sunken nut. In the Bradley patent of 1865, armor plates are screwed to the hull of a vessel by means of bolts through which a transverse fastening pin is driven. In the Pechmann patent of 1867, the parts of a bedstead are fastened together by a screw which works into a sunken nut. In the Ives patent, a meat block made of sections or blocks are drawn together by transverse bolts, which are further held down by hooks. The Sheaffer patent is another bedstead, one where the bolt screws into a socket. The Whiton patent of 1886, shows a solid rubber bicycle tire, in which is imbedded a steel strip, which is held to the felly by means of screws.

The Dodge patent of 1886, upon which the court below planted itself, shows an iron pulley with a covering of wooden segments solidly cemented together and also to the iron pulley. The wooden covering or lagging is further attached by a series of transverse metal rods, which are held to the iron rim by means of screws which screw through the rod and into the rim. A hole is made through the lagging to receive each screw, which hole is subsequently filled up with a plug. The Sprinkle patent shows a split wooden pulley, in which the arms have stay rods. The outer ends of these rods are fastened by bolts or pins, which pass transversely through the rim. The other

ends are fastened to the arms by nuts. The rim of the pulley is composed of a plurality of segments or rings, which are held together by dowel pins, and there is no thought whatever of holding these segments against displacement. The Cantwell patent of 1899 relates to a method of laying wooden floor sections above a concrete floor. A series of tubes are placed within the concrete flooring, and each floor section is fastened down at right angles to these tubes by a series of bolts. The Macloskie & Baker patent of 1891 shows a trolley wire hanger wherein the metal ear, E, is connected with the porcelain cap, C, by a screw spindle, D, which screws into the metal ear, and is riveted to a metal washer imbedded in the cap.

Most of these patents are too remote to require particular consideration. No one would doubt that the joining of parts by a dovetail connection, or the fastening of one part to another by running a bolt secured in one part into another and then securing the farther end in a nut fixed in the other, were each old in the mechanical art. And if this was all that Parcelle did there would be no invention. But it was not all. He took these old devices and put them into the composition of an armature, not merely to secure a junction of the parts, but to put the parts of such old devices in such relation to the other parts of the armature as to effect a good physical connection, and to do this in such a way as to prevent or greatly minimize the obstruction of the magnetic current resulting from the interposition of means for effecting a substantial and secure union of the pole pieces with the yoke. In none of these patents was there any attempt to solve the problem successfully handled by Parcelle, the problem which contained magnetic and electric, as well as mechanical, conditions; in other words, the problem how to construct a field magnet with laminated pole pieces detachably fastened to the solid yoke.

This brings us to the point relied upon by the court below, namely, that the Parcelle patent contained no invention—that the only idea in it was a mechanical one, that suggested by the Dodge patent, when transferred from the mechanical to the electric art. And right here let the test of invention be made. If the Dodge patent was of such a nature as to suggest a transference, by appropriate means, from the purely mechanical to the electric art, of the invention embodied in the Parcelle patent, then the Parcelle patent contained no invention. And in this connection it is certainly a singular thing that the ten patents from the mechanical art, to which we have referred, should have been in existence for so many years without ever having suggested any expedient, like the Parcelle patent, for the purpose of supplying a needed want in the electric art. Obviously, the relation between the mechanical and electric arts was not so close and apparent that it would follow as a matter of course that the invention of a method of bolting a bedstead together, or of securing a wooden covering to an iron pulley, would, of itself, furnish a suggestion for solving the problem of detachably fastening the laminated pole pieces of a field magnet to the solid yoke thereof. In other words, as stated in the case of Potts v. Creager, 155 U. S. 597, 606, 15 Sup. Ct. 194, 198, 39 L. Ed. 275:

152 F.—28

"But, where the alleged novelty consists in transferring a device from one branch of industry to another, the answer depends upon a variety of considerations. In such cases we are bound to inquire into the remoteness of relationship of the two industries, what alterations were necessary to adapt the device to its new use, and what the value of such adaptation has been to the new industry. If the new use be analogous to the former one, the court will undoubtedly be disposed to construe the patent more strictly, and to require clearer proof of the exercise of the inventive faculty in adapting it to the new use—particularly if the device be one of minor importance in its new field of usefulness. On the other hand, if the transfer be to a branch of industry but remotely allied to the other, and the effect of such transfer has been to supersede other methods of doing the same work, the court will look with a less critical eye upon the means employed in making the transfer."

Again (page 608 of 155 U. S., page 199 of 15 Sup. Ct. [39 L. Ed. 275]):

"As a result of the authorities upon this subject, it may be said that, if the new use be so nearly analogous to the former one that the applicability of the device to its new use would occur to a person of ordinary mechanical skill, it is only a case of double use; but if the relations between them be remote, and especially if the use of the old device produce a new result, it may at least involve an exercise of the inventive faculty. Much, however, must still depend upon the nature of the changes required to adapt the device to its new use."

And the court cites a number of cases illustrating the nature of the change required to constitute invention where there is a transfer of an old device, but so modified in some particular as to show new invention. After a discussion of the attempts to define what constitutes invention, the court, in McClain v. Ortmayer, 141 U. S. 419, at page 427, 12 Sup. Ct. 76, at page 78, 35 L. Ed. 800, says, in disposing of the matter:

"Courts, adopting fixed principles as a guide, have by a process of exclusion determined that certain variations in old devices do or do not involve invention; but whether the variation relied upon in a particular case is anything more than ordinary mechanical skill is a question which cannot be answered by applying the test of any general definition."

Without further discussion it is enough for us to say that we are clear in the opinion that the Parcelle patent, in the first claim thereof, does involve invention, and that we are satisfied the defendant's constructions, No. 1 and No. 4, embody infringements of this claim.

The decree of the court below is reversed. The defendant is enjoined from infringement, and is ordered to account.