# H. J. HEINZ CO. v. COHN.

(Circuit Court of Appeals, Ninth Circuit.   August 4, 1913.)

No. 2,195.

1. PATENTS (§ 157*)—ANTICIPATION—ORIGINAL AND DIVISIONAL PATENTS.
   A patent granted on a divisional application relates back to the date of the original application, and the patent granted on the latter is not in the prior art and cannot anticipate the other.
   [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 229–232; Dec. Dig. § 157.*]

2. PATENTS (§ 312*)—VALIDITY—PRESUMPTION AND BURDEN OF PROOF.
   A patent is presumptive evidence of prior invention and novelty and when produced makes for the patentee or his assignee a prima facie case which can only be overcome by proof of lack of novelty or of prior invention by another beyond a reasonable doubt.
   [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 544–549; Dec. Dig. § 312.*]

3. PATENTS (§ 41*)—COMBINATION PATENTS—NOVELTY—"PATENTABLE NOVELTY."
   A combination of old elements, which performs no new function and accomplishes no new results, does not involve patentable novelty.
   [Ed. Note.—For other cases, see Patents, Cent. Dig. § 48; Dec. Dig. § 41.*
   For other definitions, see Words and Phrases, vol. 6, p. 5234.]

4. PATENTS (§ 25*)—"INVENTION"—AGGREGATION.
   The mere aggregate of several results, each the complete product of one of the combined elements, does not involve invention.
   [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 27–29; Dec. Dig. § 25.*
   For other definitions, see Words and Phrases, vol. 4, pp. 3749–3754.]

5. PATENTS (§ 27*)—"INVENTION"—EXTENSION OF USE OF OLD COMBINATION.
   The extension of the use of an old combination of elements is not invention where no new result is produced and no new method is found for producing the old result.
   [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 31, 32; Dec. Dig. § 27.*]

6. PATENTS (§ 41*)—NOVELTY—NEW COMBINATION OF OLD ELEMENTS—"PATENTABLE NOVELTY."
   In a new combination of old elements, whereby through their new relations they perform new functions and produce a new result, there is patentable novelty.
   [Ed. Note.—For other cases, see Patents, Cent. Dig. § 48; Dec. Dig. § 41.*
   Patentability of combinations of old elements as dependent on results attained, see note to National Tube Co. v. Aiken, 91 C. C. A. 123.]

7. PATENTS (§ 27*)—"INVENTION"—TRANSFER OF DEVICE TO DIFFERENT ART.
   The transfer of a device from one branch of industry to another, so that it may be put to a new use, may constitute patentable invention, depending to some extent upon whether the uses are so nearly analogous that the adaptation would be obvious to a person of ordinary mechanical skill and upon the importance of the result.
   [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 31, 32; Dec. Dig. § 27.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

8. PATENTS (§ 36*)—INVENTION—EVIDENCE.

The presumption of novelty arising from the issuance of a patent, the general and extensive use of the new device, and the persistency with which it is infringed are all evidence of invention.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 40; Dec. Dig. § 36.*]

9. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—ENVELOPE.

The Cohn patents, No. 835,850, for a one-piece envelope with a window in the face rendered transparent by the application of an oily preparation and having a colored border to conceal its irregularity of outline, and No. 824,908, for a similar envelope with the addition of advertising devices, were not anticipated and disclose patentable novelty and invention, also *held* infringed.

Appeal from the District Court of the United States for the Second Division of the Northern District of California; William C. Van Fleet, Judge.

Suit in equity by Max M. Cohn against the H. J. Heinz Company. Decree for complainant, and defendant appeals. Affirmed.

Thomas A. Banning, Samuel W. Banning, Thomas A. Banning, Jr., and Ephraim Banning, all of Chicago, Ill., for appellant.

Chas. E. Townsend, of San Francisco, Cal., for appellee.

Before GILBERT, Circuit Judge, and WOLVERTON and DIETRICH, District Judges.

WOLVERTON, District Judge. This is a suit instituted by Max M. Cohn against H. J. Heinz Company, the user, for an infringement of certain letters patent of which Cohn is the owner. The patents, two in number, consist of an original and a divisional patent upon certain alleged inventions of Cohn as new and useful improvements in envelopes. The original application was filed November 8, 1904, the divisional January 17, 1905, and the patents issued, respectively, November 13 and July 3, 1906. Thus it will be seen that the original patent was issued later than the divisional, although necessarily applied for first. The patents are numbered, respectively, 835,850 and 824,908. The claim under the first is:

"As a new article of manufacture, an envelope with an unpunctured face of relatively opaque stock, said envelope face having a portion to which a preparation has been applied to render such portion transparent, and a colored or tinted border surrounding said transparent portion for the purpose of obliterating or concealing the effects of the tendency of the said preparation to creep into the surrounding opaque stock."

The claim under the second is:

"(1) An advertising device comprising an envelope having a window through which the addressee's name on an inclosure may show through; said window being in outline characteristic of some symbol of trade, a tinted or colored border surrounding and giving definition to said window, and permanent advertising matter forming no part of the address, appearing on said tinted border and related to and in juxtaposition with the outline of said window.

"(2) As an advertising device, an envelope having a generally opaque face except for a transparent window portion through which an addressee's name on an inclosure may show through; said window being in general outline characteristic of a symbol of trade, and permanent printed matter on the face

of the envelope related to and in juxtaposition with the outline of the window and co-operating with said outline to indicate a particular brand of goods."

The invention consists of a one-piece unpunctured envelope, of opaque or semitransparent stock, to a portion of which is applied paraffin oil and resin or grease, a preparation which renders the portion to which it is applied transparent, so that the address of an inclosure may be read through the envelope. About the transparency, which is styled a window, is printed a border of opaque coloring matter for the purpose of covering the irregular and ragged appearance caused by the tendency of the oil or grease preparation to creep or run beyond the margin of the stamp or die imprinting the window and to give definition to the window. The coloring matter, as described by the inventor, may be applied solid on the face of the envelope around the window, or it may take the form of graduated tints or shading.

The device covered by the second patent is in all essentials the same as that of the first, except that the window with its border is representative of some symbol of trade and in relation to and in juxtaposition with printed matter; the whole calculated and designed as a device for advertising purposes.

The defendant is using an envelope manufactured by the Transo Paper Company, which is a one-piece unpunctured envelope, manufactured of opaque or semitransparent stock, with an opening or window produced by an application of an oil or grease preparation, through which an address may be read, which window has a border of opaque colored matter. The border, not the window, represents in outer configuration and design a cucumber, or pickle, and there is printed on the lower flap of the envelope, on the inside, the word "Heinz," so that it may be read through the window when there is no inclosure in the envelope.

The defenses interposed are that the alleged inventions do not involve invention, nor anything beyond the exercise of ordinary mechanical skill and knowledge, that neither of them was new or novel at the time of the application and issuance of plaintiff's patents, and that each has been anticipated by prior patents; and, as to the second patent, infringement is denied.

Among other things, it is contended that Julius Regenstein, who is president of the Transo Paper Company, discovered or invented the style of envelope upon which plaintiff acquired his first patent prior to the date of its invention by the plaintiff (if it be that such envelope is a subject of invention at all), and this question we will dispose of first.

[1] The original Cohn patent will be referred to as the first, and the divisional as the second patent. Preliminarily the two cannot be considered in any way as one anticipating the other. The latter, being divisional relative to the former, relates back to the date of the original application. So that the first patent does not, with respect to the divisional or second patent, belong to the prior art. Brill v. North Jersey St. Ry. Co. (C. C.) 124 Fed. 778, 781; Suffolk Company v. Hayden, 3 Wall. 315, 18 L. Ed. 76; McMillan et al. v. Rees et al. (C. C.) 1 Fed. 722; Ide v. Trorlicht, Duncker & Renard Carpet Co.,

115 Fed. 137, 53 C. C. A. 341; Cleveland Foundry Co. v. Detroit Vapor Stove Co., 131 Fed. 853, 858, 68 C. C. A. 233.

It will be recalled that Cohn applied for the first patent November 8, 1904. During the same month he manufactured and furnished to A. Zellerbach & Sons 10,000 envelopes in pursuance of his alleged invention. Cohn puts the date of his discovery prior to October 15, 1903, and fixes it by reference to the time of his severing his connection with the Illinois-Pacific Glass Company, which was on that date. In the progress of his invention Cohn tried a great many different kinds of paper and many kinds of preparations and was not satisfied with his results; the principal difficulty encountered being the tendency of the oil preparation to creep or spread beyond the limits of the impression. Finally he struck upon the idea of printing a border about the window to obscure the irregular or ragged margin. His first experiments resulted in developing a border produced by a zincograph, having a cloud effect; the coloring growing gradually lighter as it approached the outer margin of the border. The border, however, gave a distinct and regular outline to the window. The first ink used did not seem to answer the purpose, and it was only after many experiments that a suitable kind was found. Shortly after Cohn took up his duties with the Zellerbach Company, within a week or two, he began having his printing done by F. H. Abbott & Co.; they being commercial printers. It was then that he began to apply the oil preparation by means of a printing press. Prior to that he had applied the preparation with a brush, or a wood block, or a piece of rubber, much the same as rubber stamps are used. Up to the date of October 15, 1903, he had conceived the idea of an unpunctured envelope with a window addressing space, had succeeded in making an opaque sheet transparent by the use of an oily substance, had discovered and applied a printed border about the window, and had disclosed his invention to one B. T. Bean. Cohn, however, states that he did not bring his conception to a state of perfection until about August or September, 1904. It was shortly after that he manufactured 10,000 envelopes for the Zellerbach Company. In the summer of 1904 Cohn conceived the idea of utilizing the envelope as an advertising medium by printing the border about the window to represent some article of trade, such as the outline of a cigar, a pickle or cucumber, and the like, and printing in connection and juxtaposition therewith upon the envelope the firm or trade-name of the manufacturer or dealer in such articles. Some time in October, 1904, he took samples of his invention to his attorney, which resulted in his application for patents. Shortly after consulting with his attorney, he had a well-known advertising firm make many specimens of his designs, one of which was produced and offered in evidence, representing by the shape of the window in connection with the border a cigar, with the printed matter in conjunction therewith upon the envelope, namely, "Perfecto Cigar"; the word "Perfecto" being printed above the cigar design and "Cigar" below. There are also stamped upon this envelope designs representing matches. Two other specimen envelopes of the advertising species are also referred to by the witness; one having a cigar-shaped window with the word "Cremo" printed above and

"Cigar" below, and the other the outline of the window in the shape of a pickle, with the word "Heinz" printed above and "57 Varieties" below.

Cohn's testimony is corroborated by several witnesses. Samuel E. Selling testifies that he was in the employ of the Illinois-Pacific Glass Company for 23 years; that Cohn showed him his idea of an envelope to take the place of one with a piece of paper pasted thereon forming the window, which was shortly before Cohn left the employ of the Illinois-Pacific Glass Company; and that Cohn had several samples of an entire envelope. Selling also saw samples with the advertising idea. He recognized a sample marked "R," this being a sample of an envelope constructed of transparent stock, the window being formed by rendering the remaining portion of the envelope opaque; also Exhibit L, which is one of the envelopes printed for Zellerbach & Sons. The sample of latter pattern, he says, he saw some little time after Cohn went into the employ of that firm. On cross-examination witness explained that "some little time" meant within two or three months. On redirect examination witness was thoroughly satisfied that Cohn had shown him a sample with the window produced by an oily substance before he (Cohn) had left the employ of the glass company.

B. T. Bean testifies that Cohn, while in the employ of the glass company, and before October 31st, showed him in confidence samples of an envelope after the style of an "Outlook" envelope (which latter was a two-piece envelope), except that the window was produced by some process making it transparent. The samples were of rather rough construction, having the appearance of being made up by hand. "Some of the samples were flat, just blanks, treated with this preparation. The transparent part was surrounded by a sort of a border of cloud effect."

A. Vanderweip, used the Zellerbach & Sons type of envelope in the latter part of 1904.

John C. Tooker, in the employ of F. H. Abbott, printed the Zellerbach & Sons order for 10,000 envelopes, and the earliest date that he began working for Cohn on the envelope with opaque stock was before the Christmas holidays of 1903.

Edward Epting made designs of the pattern of a one-piece envelope with transparent window for Cohn before Cohn left the glass works.

On the other hand, Julius Regenstein testifies, in substance, that some time in December, 1903, he and Mr. George Reese took to the firm of Banning & Banning a one-piece envelope of opaque stock, with a window produced by an oily preparation, for their advice respecting its patentability, and that he was advised by a letter dated December 16, 1903, that it was patentable over the Callahan patent, which is the "Outlook" two-piece envelope heretofore referred to. Regenstein was further advised that paper manufactured with opaque portions should be patented separately from the envelope, inasmuch as envelopes form one class in the Patent Office and paper another. Further testifying, Regenstein did not remember whether the window had the shape of an oval or a square, but said that the use of oil

made the transparent window. This envelope had no ring around the window. He also testified that he and Reese started to make envelopes with transparent windows with the use of oils during the first part of January, 1904. They discovered, however, the tendency of the oil to creep and to produce a ragged outline for the window, whereupon it was decided that they would go back to their "old trick" and print a border, which was intended to cover the bleeding. This feature did not consume more than one or two days. The first rings printed were too narrow, and it was found to be safer, so as to cover fully the bleeding, to print them broader. Regenstein further testifies that they completed envelopes with transparent windows, with borders or rings about the windows, some time during the month of January, 1904. Samples of such envelopes are produced, one with a much lighter border in color and width than the other. Much difficulty was experienced in producing the oily preparation for rendering the window transparent on account of atmospheric conditions, nonelastic oils, and various other causes; but at the present time the product of the Transo Company is the most perfect envelope of the kind now in existence. Regenstein attributes the credit of bringing the manufacture of these envelopes to their present state of utility to himself and Ernest Sauerman. On cross-examination Regenstein further testifies that the first envelopes his company put out of the Heinz pattern were in 1908 or 1909, and that in 1909 or 1910 he printed the envelope with the cigar pattern, but had seen the Cohn idea late in the year 1905 or in 1906, which came about by Cohn sending him parts of an envelope showing the advertising design. In a letter addressed to Max W. Cohn, of date December 10, 1906, Regenstein writes:

"We have made envelopes with a ring to cover the spreading of the oil, at least one year before you handed in your application. The idea, therefore, was not at all novel and was very old as far as we were concerned. It is very true that you have a patent which I could have obtained if I cared for it. This feature of a ring is very immaterial and we never considered it of very much consequence. We have made very successful experiments in making envelopes without a ring, and expect to have nothing else in the future, on the market, but such envelopes as mentioned."

Ernest W. Sauerman testifies that the first recollection he has of an envelope of the kind is that Regenstein and Reese came to him with some paper and oil and asked him to take an impression of the oil on the paper, which he did. Finding that the oil spread, they made a ring-plate and printed it on the paper to cover up the unevenness of the margin of the oil impression. Shortly after printing the paper in that way, the witness cut some envelopes out by hand and folded them, which he says was in the first part of January, 1904.

Joseph Wien relates that he assisted Sauerman in putting oil on envelopes, or rather on the paper of which they were to be made, and at the same time they printed a ring or border about the transparency produced by the oil. The time, he asserts, was about January 15, 1904.

Gustaf Olson, an engraver, had made plates for borders for 16 or 17 years. He testifies that he made a plate for printing a ring about

the transparency, which he thinks was in January, 1904. He afterwards saw envelopes printed by use of the plate.

Max Lau thinks he saw Regenstein and Reese working upon one-piece transparent window envelopes prior to 1904.

Adolph G. Voss testifies that he saw Sauerman and one Wien printing on paper with transparencies and a ring around them, which he thinks was in February or March, 1904.

George A. Behrens says that he saw Sauerman and Wien printing transparent portions, as well as a border around the same, at various times about five or six months prior to his leaving the American Colortype Company, which was in the latter part of May, 1904.

In this connection, it is in evidence that one George Reese, who was backed financially by Regenstein, filed in the Patent Office on January 15, 1904, a claim for an invention of a one-piece envelope with transparent window, so that an address could be read through, but without a border. This claim was rejected because anticipated by a British patent to Busch, No. 11,876, and a United States patent to Callahan, No. 701,839, and another to Brown, No. 36,393; the rejection being made some time prior to February 11, 1904. On the same date (January 15th) Reese, assignor of one-half interest to Julius Regenstein, made application for a patent on an alleged invention comprising a sheet or roll of paper adapted for the formation of a series of envelope blanks, so to be formed that, when a letter or article is inclosed within the completed envelope, the portion of the letter containing the address will show through, thus obviating the necessity of providing an additional address upon the exterior of the envelope. A patent was granted in pursuance of the application August 9, 1904. This application, or the patent issued, does not include the element of a border about the window, but one of the processes for making the window is by the application of oil or similar substance to the opaque general stock. The patent was filed in England December 28, 1904, in Canada December 16, 1904, and a French patent was issued of date April 5, 1905.

On May 9, 1904, Cohn applied to the Patent Office at Washington, D. C., for a patent, and later, namely, on June 27, 1904, applied, one John Shipp joining with him, for a British patent on an envelope without any cuts or openings in it, leaving raw edges, but which was to have a transparent space, with a comparatively opaque background, to allow the addressee's name to show through. The Washington application was rejected, but a British patent was issued. A sample envelope made in accordance with this idea was introduced in evidence marked "Exhibit R," which has been previously referred to. Cohn relates that envelopes manufactured under the patent proved unsuccessful, because the ink application for rendering them opaque except the window also rendered them brittle, and stamps would not adhere, and the public did not take to their use.

Both Cohn and Regenstein are strongly corroborated in their respective claims respecting the invention of a one-piece unpunctured envelope having a window with a border to give definition thereto; the time of discovery fixed by Cohn being in October, 1903, while that of Regenstein is prior to January 15, 1904.

The patent to Cohn is evidentiary of his prior invention. So that Regenstein (or the defendant) has not only the burden of showing that Cohn made no such discovery prior to Regenstein's alleged discovery but of amplifying his own discovery so clearly and indubitably as to overcome the effect of the patent.

It is not deemed essential that we discuss the testimony of the respective parties in detail. There are certain features that seem to dominate the controversy, and to these we will refer.

It seems clear that Regenstein had not discovered the border idea when he applied to Banning & Banning for advice as to the patentability of his supposed devices, for his attorneys wrote him of date December 16, 1903, and their letter is proof of that fact. Nor in all probability had he made such discovery at the time Reese applied for the British, French, and Canadian patents, which was as late as December, 1904, and April, 1905. Furthermore, the letter written by Regenstein to Cohn of date December 10, 1906, tends strongly to the former's discredit. By this he asserts that he made envelopes with a ring to cover spreading of oil at least one year before Cohn made his application, which was November 8, 1904. If this were so, why did he claim his discovery as late as January, 1904? Then he asserted that the ring was very immaterial, as they never considered it of very much consequence. If such were the case, it is very improbable that Regenstein and his colaborers would have spent any time in trying to devise a method for covering the creep and the ragged edges about the window. That Regenstein made envelopes with a window and border in an experimental way is very probable, but the time of the experiments does not so clearly appear. On the other hand, it appears that Cohn did not comprise his idea of a ring about the window in his application of May 9, 1904, which was rejected, nor in his application for a British patent of date June 27th. But the concept of this envelope was upon an entirely different basis. The stock was to be transparent, to be rendered opaque by the use of ink except the window, and there was no reason for employing the border, because no oily preparation was to be used, and there would be no creeping to be obscured. The inference, therefore, that Cohn had not discovered the utility of the border prior to that time, could not be so strong as with Regenstein. From a consideration of these features of the controversy, we are impelled to the conclusion that the plaintiff has made the better case.

[2] At any rate, it is very clear that the defendant has not, upon the evidence adduced, rendered its contention in the way of overcoming plaintiff's evidence, including his patent, free from doubt. The patent is always presumptive evidence of prior invention and novelty and, when produced, makes for the patentee or his assignees a prima facie case which, to overcome, requires proof of the lack of novelty, and that some one else is the prior inventor, beyond a reasonable doubt. The authorities are uniform to this purpose. Coffin v. Ogden, 18 Wall. 120, 124, 21 L. Ed. 821; Cantrell v. Wallick, 117 U. S. 689, 695, 6 Sup. Ct. 970, 29 L. Ed. 1017; Parker v. Stebler, 177 Fed. 210, 101 C. C. A. 380. This the defendant has not done.

We are now to inquire whether plaintiff's devices in envelopes, in either or both forms, involve invention. This question must be con-

sidered in two aspects; one relating to whether the supposed inven-
tions are such that they do not involve inventive faculty or genius but
merely the application of ordinary mechanical skill and knowledge,
such as any one engaged in the mechanic's art could readily apply as a
means of accomplishing a desired result; and the other relating to
and comprising the previous state of the art, which every person en-
gaged in invention is unalterably presumed to know. That is to say,
whether, having knowledge of the previous state of the art, the sup-
posed invention is such as would reasonably and naturally occur to or
suggest itself to any practical man in the exercise of ordinary me-
chanical skill and knowledge. The two aspects of the inquiry are so
interrelated in their premises and consequences that it will be more
satisfactory to discuss them together. Indeed, the insistence of coun-
sel for defendant is predicated more upon the latter aspect than the
former, for they say:

"The defense that we are now insisting upon * * * is that there was
no invention in the envelopes of the Cohn patents, when what Cohn did, over
what was known and existed before, is taken into consideration."

This involves, necessarily, the ascertainment of the prior state of
the art. In this we are to keep in mind what is claimed for the inven-
tion. It is a combination consisting of three elements, namely, a one-
piece envelope, a transparent window in the envelope produced by a
given process, to wit, the application of an oily preparation, and a
border about the window to obscure marginal irregularities in appear-
ance. This refers to the concept under the first patent. We will con-
sider the second later.

September 9, 1862, a patent was issued to J. S. Brown for an en-
velope containing a window for display of a business card or an ad-
dress. The processes for producing the window are three: One by
rendering the space designed for the window transparent by the same
means or substances as are employed for making tracing paper; an-
other by cutting out a portion of the envelope of proper size and leav-
ing the aperture uncovered; and still another by covering the aperture
with transparent paper.

In 1896 August Busch procured a British patent for postal enve-
lopes, differing from others in that a portion or the whole of the en-
velope is transparent. The patent further specifies:

"In some cases the front of the envelope is made of transparent material,
while the back is opaque, or vice versa; or a portion of the front may be
transparent, while the rest of the envelope is opaque, or the back and a por-
tion of the front may be transparent. The desired contrast or difference may
be produced either by choosing two different kinds of paper or by printing
with opaque coloring matter applied to a portion of the envelope."

Simply stated, this concept comprises the use of transparent stock
rendered opaque as to portions of envelope desired by application of
coloring matter.

On June 10, 1902, Americus F. Callahan secured a patent for an
envelope, which may be styled a two-piece envelope, and which is pro-
duced by cutting the window in the envelope and covering it from the
inside with transparent paper permitting the address to be read
through.

Beyond these evidences of the state of the art, Cohn has testified touching a device that consisted in simply cutting an aperture in the envelope for the address to be read through, concerning which he relates that complaint was made of it by the postal authorities because of the unprotected edges of the aperture catching and tearing through handling in forwarding and distributing the mails, and that the concept proved unsuccessful and its use was abandoned.

In this relation the Reese patent for a series of envelope blanks, and the Cohn and Shipp British patents, both heretofore noted, may be referred to, although, having been issued subsequent to plaintiff's invention, it is doubtful if they are relevant as bearing upon the prior state of the art.

Tracing a different variety of old art, defendant's counsel invoke an art pertaining to three-color picture printing, printing of lithograph labels, and printing in general, in connection with which borders have been employed to give regularity, finish, and decoration to the picture, labels, or matter in print. Regenstein relates that he had been for some time prior to the date of plaintiff's supposed invention engaged in printing three-color pictures, and that, in order to give finish, in many instances a border was printed about the outer edges to cover any irregularities that might arise from applying the three colors. The idea, he thinks, has been applied in the art for something like 20 years. As illustrative of this character of art, certain art calendars have been produced showing borders of various styles. Some are printed, plain or decorative; some, one in particular, designed to show a mat as a frame for the picture; some are merely stamped upon the paper; and some, being stamped, are gilded for decorative purposes.

Another variety of old art is one that pertains to the decoration of windowpanes, and the Tudor patent, issued in 1877 and reissued in 1878, is referred to for illustration. The invention consists in paper having opaque lines printed, painted, or stained thereon, resembling the outlines of leaden sash bars, and transparent coloring applied by printing, staining, or painting to the spaces between the opaque lines. In rendering spaces and portions more or less transparent, oil, resinous substances, and varnish are used. In the same relation, the Smith and Browne patent of 1902, relating to the production of posters, labels, etc., is referred to.

Then, again, still another style of art is produced, illustrated by the Hole patent of 1894 and the Boldt patent of 1897, as indicating the prior state of the art. The first of these relates to the construction of perforated coin bags for use in banks, railway shops, and like places, and the latter to packing cases for hooks and eyes, pins, and other like articles, constructed with a window of suitable transparent material to permit the contents to be seen through.

These, with others not necessary to take special note of, are all brought forward as illustrating and showing the prior state of the art. Of all these, it may be conceded, for the purposes of this controversy, that the plaintiff had notice and knowledge. In view of the premises, has the plaintiff, in the production of his supposed art, exercised inventive faculty, or has he merely applied ordinary mechanical skill,

such as would occur to any artisan in the prosecution of his particular occupation?

As it relates to the particular art of the production of a one-piece envelope with a transparent window and a border, we find nothing in the older prior art that has been brought to the state of perfection that Cohn's concept has been. As to the first element, namely, a one-piece envelope, that is old. As to the second, namely, the transparent window in envelopes, produced by the application of an oily preparation, that is new in envelopes but apparently old in the decorative art. And, as to the border, that is new as applied to a window in envelopes but old as applied in other arts.

[3] A few principles in patent law may be stated as an aid towards the solution of the problem before us. A combination of old elements, which performs no new function and accomplishes no new results, does not involve patentable novelty. Knapp v. Morss, 150 U. S. 221, 227, 14 Sup. Ct. 81, 37 L. Ed. 1059.

[4] Nor does the mere aggregate of several results, each the complete product of one of the combined elements, involve inventive faculty. Mosler Safe Co. v. Mosler, 127 U. S. 354, 361, 8 Sup. Ct. 1148, 32 L. Ed. 182.

[5] Nor is the mere extension of the use of an old combination of elements invention where no new result is produced and no new method is found for producing the old result. Voigtmann v. Weis & Ridge Cornice Co., 148 Fed. 848, 78 C. C. A. 538. See, also, Schweichler v. Levinson, 147 Fed. 704, 78 C. C. A. 92.

[6] But in a combination of elements that are old, whereby through their new relation they perform new functions and produce a new result, there is patentable novelty. Hailes v. Van Wormer, 20 Wall. 353, 22 L. Ed. 241; Taylor v. Sawyer Spindle Co., 75 Fed. 301, 22 C. C. A. 203.

Mr. Justice Hunt states the principle succinctly in Reckendorfer v. Faber, 92 U. S. 347, 357 (23 L. Ed. 719). He says:

"The combination, to be patentable, must produce a different force or effect, or result in the combined forces or processes, from that given by their separate parts. There must be a new result produced by their union; if not so, it is only an aggregation of separate elements."

See, also, Pickering v. McCullough, 104 U. S. 310, 26 L. Ed. 749.

[7] Novelty, however, may consist in transferring a device of one branch of industry to another, so that it may be put to a new use. In such case, whether the concept of transferring the device and putting it to a new use is the result of inventive faculty "depends," says Mr. Justice Brown in Potts v. Creager, 155 U. S. 597, 15 Sup. Ct. 194, 39 L. Ed. 275—

"upon a variety of considerations. In such cases we are bound to. inquire into the remoteness of relationship of the two industries; what alterations were necessary to adapt the device to its new use, and what the value of such adaptation has been to the new industry. If the new use be analogous to the former one, the court will undoubtedly be disposed to construe the patent more strictly and to require clearer proof of the exercise of the inventive faculty in adapting it to the new use, particularly if the device be one of minor importance in its new field of usefulness. On the other hand, if the transfer be to a branch of industry but remotely allied to the other, and the

effect of such transfer has been to supersede other methods of doing the same work, the court will look with a less critical eye upon the means employed in making the transfer. Doubtless a patentee is entitled to every use of which his invention is susceptible, whether such use be known or unknown to him; but the person who has taken his device and, by improvements thereon, has adapted it to a different industry may also draw to himself the quality of inventor."

And further:

"If the new use be so nearly analogous to the former one that the applicability of the device to its new use would occur to a person of ordinary mechanical skill, it is only a case of double use; but if the relations between them be remote, and especially if the use of the old device produce a new result, it may at least involve an exercise of the inventive faculty."

Archbald, D. J., states the principle in another way, but concretely, as follows:

"That the mere mechanical adaptation of an old device to an analogous one is not invention, while a new application in a different art, whereby a new and distinct result is produced, will be." Diamond Drill & Machine Co. v. Kelly Bros. (C. C.) 120 Fed. 289, 292.

See, also, General Electric Co. v. Bullock Electric Mfg. Co., 152 Fed. 427, 81 C. C. A. 569; Hale & Kilburn Mfg. Co. v. Oneonta, C. & R. S. Ry. Co. (C. C.) 124 Fed. 514.

All the elements in plaintiff's device being old, the novelty, if it has any, consists in the combination and in their application, or the application of a part, or one or more of them, to a new use; such use resulting from a transference from one branch of industry to another. Thus we find, from a review of the state of the art, that an oily preparation for rendering opaque stock transparent in envelopes was not so used or applied prior to the invention by Cohn and Regenstein; the latter's discovery being the later, as we have previously determined. But it was applied, as shown by the Tudor patent issued in 1877, in the decorative art to prepared paper for ornamenting glass windowpanes. Manifestly Brown had not struck upon the idea in envelopes when he secured his patent in 1862, for the patent declares that the transparent portion of the envelope or wrapper may be so rendered by the same means or substances as employed for making tracing paper, or any other, in the process of manufacturing the paper or the envelope. It must be conceded that such process is widely different from the process of rendering paper transparent by the application of a grease or oily preparation. A patent that comes nearer to the one in controversy in the character of the art is the Smith and Browne patent for combined opaque and transparent posters, labels, and the like, in which the transparent portions were so rendered by the use of spirit varnish but not by a grease or oily preparation.

As it respects the border, that is an element and a concept very common and old in several arts. It is employed as a plain band in the printing and decorative arts, and also it may represent the rim of a mat or the frame of a picture. In concept the border is the same thing as a frame of a picture, or the casing to a door or a window in mechanics. In all these the manifest purpose is to cover defects, correct irregularities, conserve the finish, and add decoration to the par-

ticular thing under construction. And yet it is worthy of remark that it was never applied to cover defects produced by the creep of grease or oil applied to paper until Cohn did it.

The Busch patent, like the Reese patent and the Cohn English patent, has not the element of a border in its simplest form. The envelopes in the Busch and Cohn English patents are produced by the use of transparent paper rendered opaque except the portion left for reading through, be it large or small, and in these there was no purpose to subserve, such as covering ragged edges or irregularities arising from any cause. The Reese patent, although the window is produced by the application of an oily preparation, is absolutely without the concept of a border, although the border has proven to be essential to cover the ragged edges and to give definition to the window. This had not even suggested itself to Regenstein, although counsel for defendant claim now that the application of the border was a thing of ordinary mechanical skill.

It is often difficult, as has been remarked by the authorities, to distinguish between the exercise of inventive faculty and the application of ordinary mechanical skill.

In Stimpson v. Woodman, 10 Wall. 117, 19 L. Ed. 866, it was held that the stamping of the figure upon the surface of a roller for pebbling leather by pressure, where the use previously had been of a smooth roller, required no invention. In Brown et al. v. Piper, 91 U. S. 37, 23 L. Ed. 200, invention was denied to one who applied the principle of an ice cream freezer to the preservation of fish. In Roberts v. Ryer, 91 U. S. 150, 23 L. Ed. 267, it was declared that so changing the proportions of a refrigerator as to utilize the descending instead of the ascending current of cold air was not invention. And in Atlantic Works v. Brady, 107 U. S. 192, 2 Sup. Ct. 225, 27 L. Ed. 438, that the placing of a dredging screw at the stem instead of at the stern of a steamboat lacked in invention.

On the other hand, many instances may be found where very simple concepts have been declared to be the product of inventive genius. Two instances which are fair illustrations are referred to in Potts v. Creager, supra. One was respecting the application to telegraph instruments of a torsional spring such as had been previously used in clocks, doors, and other articles of domestic furniture (Western Electric Company v. La Rue, 139 U. S. 601, 11 Sup. Ct. 670, 35 L. Ed. 294), and the other the substitution of the use of anthracite coal for bituminous in smelting iron ore, inasmuch as it produced a better article of iron at less expense (Crane v. Price, Webster's Pat. Cas. 409). Thus it is that simplicity of device is not necessarily the test of lack of invention or patentability. When a thing has succeeded it often seems very plain and simple, and the wonder is that its suggestion had not come earlier; but the fact remains that no one has ever thought of it, whether skilled or not, and yet its utility is at once recognized when brought to public attention. This of itself is evidence of invention. As is said by Mr. Justice Bradley in Loom Co. v. Higgins, 105 U. S. 580, 591 (26 L. Ed. 1177):

"It may be laid down as a general rule, though perhaps not an invariable one, that if a new combination and arrangement of known elements produce a new and beneficial result, never attained before, it is evidence of invention."

[8] Beyond this, the presumption of novelty attending the issuance of letters patent, the general and extensive use to which the new device is applied, and further the use persisted in by one infringing the device are all evidence of the product of inventive faculty and genius. Diamond Rubber Co. v. Consol. Rubber Tire Co., 220 U. S. 428, 31 Sup. Ct. 444, 55 L. Ed. 527; A. R. Milner Seating Co. v. Yesbera, 133 Fed. 916, 67 C. C. A. 210; Buchanan v. Perkins Electric Switch Mfg. Co., 135 Fed. 90, 94, 67 C. C. A. 564; Morton v. Llewellyn et al., 164 Fed. 693, 90 C. C. A. 514.

It is an admitted fact that the Transo envelope has grown rapidly into general use. Such is not the case with any other patent on envelopes in any form, except the Callahan patent, which does not anticipate Cohn's concept. Regenstein declares in his testimony that "the ring on a Transo envelope adds in every way to the clean and perfect appearance of the envelope." And he further testifies that "the clean and artistic appearance of the envelope adds to its merchantableness," and that they do not put out any envelopes without the ring. This in the face of his declaration to Cohn by letter of December 10, 1906, that "this feature of a ring is very immaterial, and we never considered it of very much consequence." He testifies, furthermore, that for the last six years, ending February, 1911, he gave almost exclusively to the promotion of the Transo envelope. But he had previously testified:

"Our envelope is now considered the most perfect transparent envelope in existence and has a sale in this country as well as in foreign countries. * * * To my knowledge, I am the only manufacturer and have never seen any one-piece transparent envelopes made by any one else in this country."

We are strongly impressed that all this, including the proven and acknowledged utility of this envelope, which is a duplication of the Cohn envelope (first patent), is sufficient to settle any doubt in favor of the presumption of novelty which attends the patent. The Acting Commissioner of Patents, in his final analysis of the claim, says that:

"While the final result is to enhance the appearance by concealing the irregular outline, the result is brought about by mechanical features, namely, the application of the printed border to a portion of the paper to which the oily preparation has been applied."

[9] We conclude, therefore, that the combination, consisting of a one-piece envelope, having the window rendered transparent by the application of an oily preparation, together with the border to conceal the irregular outline produced by the use of the oily preparation and to give definition to the window, is the result of inventive faculty and not of mere application of ordinary skill and adaptation. Nor is there anticipation by any prior patent. Infringement as to this patent is conceded.

As it relates to the second patent, there is little more to be said. The one-piece envelope with the transparent window and the plain border being patentable, the one-piece envelope with the transparency and border so modeled as to represent some article of manufacture, or the trade-mark of the manufacturer, employed in connection with printed matter so as to produce a device for advertisement, is, upon

like principles, manifestly the result of invention. The defendant's attempt to vary the concept by printing the name of the manufacturer on the inside of the lower flap of the envelope so that it may be read through the transparent window, of the usual shape, when no inclosure is within the envelope, is an equivalency or a distinction without a difference in principle and is also an infringement.

These considerations lead to an affirmance of the decree, and such will be the order of this court.